

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| LUIS ENRIQUE RODRIGUEZ, | § | No. 08-16-00118-CR |
| Appellant, | § | Appeal from the |
| v. | § | 34th District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC#20120D05089) |

## O P I N I O N

By indictment, Appellant Luis Enrique Rodriguez[1] was charged with capital murder and two counts of engaging in organized criminal activity with regard to the death of Luis Fierro and Roberto Renteria. Following a trial, a jury acquitted Appellant of the murder of Fierro and one count of engaging in organized criminal activity, but found him guilty of engaging in organized criminal activity with regard to the murder of Renteria. As punishment, the jury assessed, and the court imposed, a sentence of confinement for a period of 99 years and a maximum fine of $10,000.

On appeal, Appellant argues he was prosecuted under a fatally flawed indictment that carried forward its defect to the court's charge to the jury. Both instruments, he claims, were flawed in their omission of an intent element required by the charge of organized criminal activity.[2]

---

[1] Appellant Rodriguez is also known by his street name "Silent" or "Silencio."

[2] TEX. PENAL CODE ANN. § 71.02(a) (West Supp. 2017).

In addition, Appellant argues that his constitutional rights were violated in that his conviction resulted from his mere membership in a criminal street gang; that the evidence was legally insufficient to support his conviction; that the trial court failed to properly respond to questions submitted by the jury; and that the trial court erred by ruling against his claim of spousal privilege. We affirm.

## FACTUAL BACKGROUND

At trial, Appellant and others testified he was a member of the Barrio Azteca street gang that operates widely in the El Paso area. Similarly, evidence showed that victim Luis Fierro[3] was also a Barrio Azteca member. Victim Roberto Renteria,[4] however, who was Fierro's son-in-law, was not a member, but instead, appeared to be an unfortunate individual who found himself at the wrong place at the wrong time.

### The Barrio Azteca's Operations

During the trial, Detective Andres Sanchez of the El Paso Police Department, who had specialized training and experience with investigations of gang activity, testified about the Barrio Azteca gang, its organizational structure, and its operations. Originally, the Barrio Azteca formed to protect Hispanic inmates of El Paso who were in need of protection from gangs operating in Texas prisons. Eventually, it expanded outside of prisons and began operating in the streets of El Paso. Sanchez described the gang as a highly-structured organization, formed with a constitution, that followed rules and a para-military structure; "captains" or "capos" are at the highest level of

---

[3] Victim Luis Fierro was also known by the street name "Chuco."

[4] Victim Roberto Renteria was also known as "Chavalon" or "the kid."

2

its leadership, followed by "lieutenants," "sergeants," and lastly, "soldiers." The captains are responsible for assigning a "rank" for each member. At the time of Appellant's trial, four of the five captains of the gang were serving time in various prisons throughout the country. Despite being imprisoned, captains coordinated operations by using cell phones smuggled into prisons and by sending coded messages through calls and letters to outsiders.

Detective Sanchez and others testified that the gang sustained itself, in part, by a form of extortion, in which they imposed a "tax," or "cuota," on others who sold drugs in the area. The Barrio Azteca divided the city into "sections," then required members to collect taxes from dealers operating in respective sections. Tax money collected was routinely placed in a "box," which was kept by a person of "trust," who would then make distributions to other members and include those who were incarcerated. In essence, the holder of the box acted as a banker, or "treasurer," of gang operations. Occasionally, the box included information about individuals who were believed to be "snitches," or who had otherwise made incriminating statements against members facing legal proceedings. By use of the box, information was routinely passed from lower to higher-ranking members.

At trial, Veronica Cera testified as a witness who had knowledge of gang activities from her personal history of helping gang members sell drugs and collect taxes.[5] Cera was considered a "trusted courier," or an "esquina," which is someone, such as a girlfriend, who helped the gang but was not a member. In 1998, at twenty-one or twenty-two years of age, Cera began dating a Barrio Azteca member and often went with him as he collected tax money from dealers in the area.

---

[5] Cera was given immunity for her testimony by the federal government.

Over time, she too started selling cocaine for gang operations. When her boyfriend was arrested, Cera dated another member and helped him distribute heroin for a period of a year and a half. After her new boyfriend was arrested, she continued selling without him to keep his business going. Other gang members objected because she was not a member. By its rules, Barrio Azteca did not allow women to be members, Cera explained. For a year and a half, she then worked at a restaurant. Once again, however, she started dating another member who was nicknamed "Filo." He too was arrested after being charged with capital murder. Cera then started dating Luis Fierro and eventually became his wife.

As for Fierro, Cera testified he worked his way up from being a soldier to being, at one point, one of the gang's higher-ranking lieutenants in charge of an area. As a soldier, Fierro's lieutenant was Ricardo Zuniga,[6] who was also known as "Nano." After a warrant was issued for his arrest, Zuniga moved from El Paso to Juarez. Often taking her children with her, Cera would cross to Juarez to pick up drugs and deliver the Barrio Azteca box to Zuniga. Eventually, Zuniga called Fierro and Juan Espino,[7] another member, and asked them to go to Juarez to speak with him. Because he needed help collecting taxes, Zuniga elevated each of their rank to sergeant.

Cera testified she would help Fierro with his new responsibilities which included collecting taxes from dealers, writing checks for gang members in the prison system, delivery of money to Zuniga in Juarez, and payment of lawyer fees for members that were incarcerated. On a daily basis, Cera had contact with other members, who came and went picking up drugs or bringing

---

[6] Ricardo Zuniga ("Nano") was convicted of engaging in organized criminal activity in the unrelated murder of two alleged drug dealers who were members of another gang who allegedly failed to pay their cuota to the Barrio Azteca gang. *See Zuniga v. State,* No. 08-14-00153-CR, 2016 WL 5121992, at *2 (Tex.App.--El Paso Sept. 21, 2016), *rev'd,* PD-0174-17, 2018 WL 2711145 (Tex.Crim.App. June 6, 2018).

[7] Juan Espino is a Barrio Azteca member who is known by the street name "Vago."

4

money to Fierro. Of these members, she described Appellant as being calm and quiet, but others, she said, were "bossy, obnoxious, [and] real mean," referring to members Juan Cornejo[8] and Eddie Noriega.[9]

While Zuniga operated from Juarez, Cera kept going across the border to take him money and information Fierro received from other members including those who were incarcerated. Occasionally, information she took included copies of criminal cases which revealed witnesses who had "snitched" against gang members in legal proceedings. One day, she and Fierro received information at their home about the trial of her former boyfriend Filo.[10] The information left on her doorstep included a statement she herself had given to authorities. Cera burned the information. Soon, however, she and Fierro received a sealed envelope, which they opened, that again included statements of the Filo trial and other items intended for Zuniga. They removed only her statement, resealed the envelope, then she delivered it in Juarez. When Zuniga read the information in the envelope references remained about her having accused Filo of a murder in El Paso. Cera testified that after Zuniga saw the information, he told her she needed to be "checked," meaning that Fierro needed to slap her around for having made such a mistake. Although Fierro never did hit her, she told other members that he actually had.

Sometime later, Fierro went to a party at Zuniga's house and called her to take them some beer and cocaine. While she was there, she saw Appellant, Cornejo, Noriega, Espino, Zuniga,

---

[8] Juan Cornejo is a Barrio Azteca member who is known by the street name "Kiddo."

[9] Eddie Noriega is a Barrio Azteca member who is known by the street name "Wicked."

[10] Fidencio Valdez was convicted of capital murder and sentenced to death in *Fidencio Valdez v. Texas*, AP-77,042, 2018 WL 3046403, at *1 (Tex.Crim.App. June 20, 2018) (not designated for publication).

and another member, all talking in a group. She overheard Cornejo say, "Somebody's going to die." She felt nervous and asked Fierro to leave with her, and he did. From that point forward, Fierro told Zuniga he had an outstanding warrant and could no longer meet him in Juarez, although he was not telling the truth. Cera continued to go for Fierro.

After Zuniga was arrested, he talked to Fierro about taking over his responsibilities, referred to as "passing on his muscle shirt," explaining he would be too restricted while he was incarcerated. Zuniga then elevated Fierro from sergeant to lieutenant. With new responsibilities, Fierro, in turn, elevated the rank of Appellant, Cornejo, and Noriega, all of whom were raised to sergeants. Due to his calm nature, Fierro gave Appellant responsibility for the box.

Cera testified that friction arose between Fierro, her husband, and other gang members. Fierro, she explained, was an addict, and he began taking heroin without paying for it, and was not performing his gang responsibilities effectively. Also, Fierro owed money to Zuniga and his father. To make matters worse, gang members continued to suspect Cera had snitched to authorities on Filo and later on Zuniga.

A few weeks before the murders occurred, various gang members, including Appellant and Espino, held a meeting at which Fierro's rank was "parked," meaning that Fierro no longer had the authority to participate in the gang's activities and no longer had control of the box. Detective Sanchez testified that local law enforcement working with an FBI task force had many members of the gang under surveillance at the time. Through their surveillance, authorities learned that

6

both Fierro and Cera had been "green lighted," which meant that a high-ranking member of the gang had given orders to execute them.[11]

## The Events of August 22, 2012

Cera testified that Fierro had previously written a letter to a prison capo named Manuel Tolon Cardoza ("Tolon"), complaining about his situation after the other gang members had parked his rank and had taken the box away from him. She recalled that on August 22, 2012, the day of his murder, Fierro received a letter in the mail from Cardoza informing him that he had his "blessing," and that he was being given back his rank. According to Cera, Fierro immediately called Appellant and informed him of the letter, and advised Appellant that he was parking the rank of various gang members, including Appellant, Espino, Noriega, and Cornejo, and that he wanted the box returned to him. Cera also recalled that Cornejo spoke with Fierro during this same phone call, and advised Fierro that they were willing to abide by Tolon's decision, but asked Fierro to come meet with them at Noriega's house to show them the letter. Cera recalled that Fierro left their house at approximately 5 p.m to attend the meeting, but he asked Renteria to drive him, as he was not feeling well due to his heroin addiction.[12] Cera described that Fierro was wearing a gold chain necklace around his neck when he left their house.

At trial, Appellant's girlfriend, Irma Lara, who had been living with him since 2009, testified that not only was Appellant a member of Barrio Azteca, she more specifically described that he was involved in gang activities with Cornejo, Noriega, Espino, and Fierro. Noriega and

---

[11] Among other things, law enforcement had positioned a video camera on a pole outside of Fierro's house in order to monitor his activities.

[12] The fact that Fierro received a letter in the mail that day, as well as the fact that he later left his house that same afternoon with Renteria, was confirmed by the surveillance video from the "pole cam" that law enforcement had directed at Fierro's house at the time.

7

Cornejo were his closest friends and they frequently came and went from their house. She was aware that Appellant had been trusted to keep the box that held money that members had collected. She said that Appellant did not like having the box, he felt pressured. In the days leading up to the murders, she testified there had been tensions between members. Lara reported that there was a power struggle occurring within the gang's membership between Fierro and others, and that Appellant had aligned himself with Espino, Cornejo, and Noriega, against Fierro.

Lara recalled that on the afternoon of Fierro's murder, Appellant left the house with Cornejo and Noriega. As he left, Appellant told Lara that he had a meeting to attend, and that he was taking a gun with him in case something happened. Lara testified that when Appellant returned a couple of hours later, he appeared "nervous" and confessed to her that he and the others had taken Fierro and Renteria to an area in Socorro, Texas, in Espino's truck, and had killed both of them. According to Lara, Appellant admitted to her that he and another member named "Garfield" shot Renteria, while Noriega and Cornejo shot Fierro. She also said Appellant told her that Fierro had been killed because he and Cera had "turned in Nano [Zuniga]," and that Renteria had been killed because he was a witness to Fierro's killing. According to Lara, shortly after Appellant confessed, he took a shower and then the two of them left for a party.

In addition to their conversation, Lara also testified about interactions she observed between Appellant and other gang members. She said that most of the time relationships were friendly except she noticed tension between Cornejo ("Kiddo") and Fierro ("Chuco"). She spoke of one argument that escalated when Fierro went up to Cornejo and yanked a chain from his neck while he was wearing it. In the moment, Cornejo did not react but she saw he was embarrassed. After Fierro's murder, Lara saw Cornejo wearing a chain and learned from Appellant that Cornejo

8

took it from Fierro's neck after he died. At trial, Lara identified Cornejo wearing the chain in images that were taken from a video camera at a McDonald's on the day of the murders.

In addition to the other witnesses, the deputy medical examiner who performed autopsies on the victim's bodies also testified at trial. The medical examiner testified that Fierro and Renteria both died from multiple gunshot wounds to their heads and bodies. Before the trial concluded, the defense recalled Detective Sanchez and he testified that Cornejo and Noriega were separately convicted of the murders of Fierro and Renteria. Noriega pled guilty and a jury convicted Cornejo after a trial.

### Appellant's Version of Events

At his trial, Appellant admitted he was a long-time member of Barrio Azteca and that on the day of the murders, he was at Noriega's house, along with Noriega and Cornjeo, when Fierro had called to inform them that he had been made a lieutenant again, that he was taking away the others' ranks, and that he wanted to call a meeting. Appellant testified that he did not attend the meeting because he and Lara had plans to go to a party so he left Noriega's house beforehand. Data from his cell phone, however, placed him in the general area of the murders later that afternoon. Nontheless, Appellant claimed that he had left his cell phone at Noriega's house, as Noriega and Cornejo were still speaking with Fierro on his phone when he left to return home

### The Verdict

Following trial, the jury acquitted Appellant of the capital murder charge, and the engaging in organized criminal activity charge with respect to the murder of Luis Fierro; however, the jury found him guilty of engaging in organized criminal activity with respect to the murder of Roberto Renteria. This appeal followed.

9

# I.

## ISSUES ONE THROUGH FOUR:   THE ADEQUACY OF THE INDICTMENT AND THE JURY CHARGE

In four issues, Appellant contends that both the indictment that charged him with the offense of engaging in organized criminal activity, and the jury charge that instructed the jury, left out an essential element of the offense as defined by the penal code.   Appellant was charged under section 71.02 of the Texas Penal Code titled, "Engaging in Organized Criminal Activity." TEX.PENAL CODE ANN. § 71.02 (West Supp. 2017).   Penal Code section 71.02(a) provides that: "[a] person commits an offense if, with the intent to establish, maintain, or participate in a combination or in the profits of a combination or as a member of a criminal street gang, the person commits or conspires to commit one or more of the following:"[.]   *Id.* § 71.02(a).   The statute then lists eighteen subsections detailing predicate offenses such as murder, capital murder, arson, and others, that give rise to a conviction under the statute.   *Id*. § 71.02(a)(1)-(18).   For purposes of the offense, section 71.01(d) defines a "criminal street gang" as "three or more persons having a common identifying sign or symbol or an identifiable leadership who continuously or regularly associate in the commission of criminal activities."   *Id*. § 71.01(d) (West 2011).   A "combination," on the other hand, is defined as: "three or more persons who collaborate in carrying on criminal activities, although: (1) participants may not know each other's identity; (2) membership in the combination may change from time to time; and (3) participants may stand in a wholesaler-retailer or other arm's-length relationship in illicit distribution operations."   *Id*. § 71.01(a).

To commit an offense, Appellant contends the engaging in criminal activity statute requires proof that a person acted with the intent to establish, maintain or participate, as a member of a

criminal street gang, when committing one of the listed predicate offenses. On appeal, he contends that nothing in the jury charge informed the jury that to find Appellant guilty of engaging in organized criminal activity, it had to find beyond a reasonable doubt that he "acted with the intent to establish, maintain, or participate," as a member of a criminal street gang.[13] Rather, the indictment and jury charge omitted intent and merely stated that Appellant had committed the underlying offense of murder "as a member of a criminal street gang." Appellant contends the "intent" language is an essential element of the offense, whether a person is charged with committing a predicate offense under either the "combination" portion, or under the "criminal street gang" portion of the statute.

The State, on the other hand, contends that the "intent" language only applies to cases in which a defendant is charged with committing a predicate offense as part of a "combination," and does not apply to an offense committed as part of a "criminal street gang." Under a common-sense and grammatically correct reading of the statute, the State contends it was not necessary to allege or prove that Appellant committed the predicate offense "with intent to participate as a member of a criminal street gang."[14]

---

[13] Count Three of the indictment alleged that "on or about the 22nd day of August, 2012 ... [Appellant] did then and there, as a member of a criminal street gang, to wit: Barrio Azteca, commit the criminal offense of Murder of Roberto Renteria ..." The jury charge tracked this same language, and defined the offense for the jury as follows: "Our law provides that a person commits the offense of engaging in organized criminal activity, if as a member of a criminal street gang he commits or conspires to commit the offense of murder." Similarly, the application portion of the jury charge stated that the jury could find Appellant guilty of Count Three in the indictment if it found that Appellant "did then and there as a member of a criminal street gang, to wit: Barrio Azteca, commit the offense of murder against Roberto Renteria, acting either alone or with the intent to promote or assist the co-defendants, and solicited, encouraged, directed, aided or attempted to aid the co-defendants as a member of a criminal street gang, to commit the murder of Roberto Renteria, as alleged in the indictment …."

[14] The State also argues that even if the "intent" language in the statute was applicable to the charge in Appellant's case, he waived his right to raise these issues on appeal due to his failure to object to either the indictment or the jury charge in the trial court. Because we conclude that there was no error in the indictment or in the jury charge, we find it unnecessary to address the issue of waiver.

### The *Zuniga* Opinion

On point with the issue at hand, the Court of Criminal Appeals recently addressed the necessary evidentiary requirements of the engaging in criminal activity offense as applied to an allegation of membership in a criminal street gang. In *Zuniga v. State*, ___ S.W.3d ___, PD-0174-17, 2018 WL 2711145, at *4 (Tex.Crim.App. June 6, 2018),[15] the State charged a defendant with two counts of engaging in organized criminal activity under the same penal code section, section 71.02(a), as was charged in the instant case. In *Zuniga*, the State charged the defendant with committing two predicate murders "as a member of a criminal street gang, to wit: Barrio Azteca." *Zuniga*, 2018 WL 2711145, at *1 n.2. On intermediate appeal, the defendant in *Zuniga* persuaded this Court that the State was required to allege and prove that he acted with the "intent to establish, maintain, or participate as a member of [a criminal street gang]." *See Zuniga v. State*, 2016 WL 5121992, at *13 (Tex.App.--El Paso Sept. 21, 2016), *rev'd*, PD-0174-17, 2018 WL 2711145 (Tex.Crim.App. June 6, 2018). Thus, we held the "intent" language of the statute constituted an essential element of the offense, and found that there was insufficient evidence in the record to establish that the defendant acted with the requisite intent. *Id.*

The Court of Criminal Appeals, however, disagreed with our statutory interpretation, noting that we did not have the benefit of its more recent holding in *Villa v. State*, 514 S.W.3d 227, 232 (Tex.Crim.App. 2017), when we issued our opinion. *Zuniga,* 2018 WL 2711145, at *4. Although the Court in *Villa* did not expressly resolve the issue of intent, in *Villa* the Court resolved

---

[15] The Court of Criminal Appeals issued *Zuniga v. State*, ___ S.W.3d ___, PD-0174-17, 2018 WL 2711145 (Tex.Crim.App. June 6, 2018), after the parties submitted their briefs to this Court and after oral argument was held. The State submitted a Supplemental Letter of Authorities arguing that *Zuniga* resolved any questions regarding the adequacy of the indictment and the jury charge of the present case. Appellant did not file a response.

a challenge to the sufficiency of the evidence to support a conviction for engaging in organized criminal activity, and in doing so, held that it was sufficient to establish that the defendant committed the predicate offense of aggravated assault "as a member of a criminal street gang," without any mention of the "intent" language in the statute. *Villa*, 514 S.W.3d at 232-33.

Thereafter, addressing the issue directly, *Zuniga* held that its description of the relevant statutory elements in *Villa* had signaled the State's reading of the statute had been correct and our interpretation in *Zuniga* was erroneous. *Zuniga,* 2018 WL 2711145, at *4. As a matter of grammar and logic, the Court of Criminal Appeals concluded that the "statute's intent clause applies only to the phrase that immediately follows it—'in a combination or in the profits of a combination'—but not to the subsequent phrase, 'or as a member of a criminal street gang [.]'" *Id*., at *4 (citing TEX. PENAL CODE ANN. § 71.02(a)). The Court therefore found that a defendant could be properly charged and convicted of committing a predicate offense "as a member of a criminal street gang," as that term is defined by the code, without requiring commission of the underlying crime with the intent to establish, maintain or participate as a member of a criminal street gang. *Id*., at *4 (citing *Villa,* 514 S.W.3d at 232; TEX. PENAL CODE ANN. § 71.02(a)).

And finally, *Zuniga* "interpret[ed] the word 'as' in the phrase 'as a member of a criminal street gang' as requiring proof that the defendant was acting '[i]n the role, capacity, or function of" a gang member at the time of the offense." *Id*., at *4 (citing American Heritage College Dictionary 78 (3d ed. 1993) (defining the word "as")). To satisfy this requirement, *Zuniga* held that the evidence must show some nexus or relationship between the commission of the underlying offense and the defendant's gang membership. *Id*., at *7.

**Analysis**

13

In light of the holding in *Zuniga*, we conclude that Appellant was properly charged in the indictment with committing the predicate offense of the murder of Roberto Renteria, "as a member of a criminal street gang, to wit: Barrio Azteca[.]" Similarly, we conclude that the jury charge properly instructed the jury that it could find Appellant guilty if he "did then and there, as a member of a criminal street gang, to wit: Barrio Azteca," commit the offense of murder against Roberto Renteria, as alleged in the indictment. And finally, in accord with the statute, we note that the jury charge properly defined the term "criminal street gang," as "three or more persons having common identifying signs or symbols or an identifiable leadership who continuously or regularly associate in the commission of criminal activities." Accordingly, we find the indictment and jury charge both properly set out the elements of the charged offense of engaging in organized criminal activity as a member of a street gang.[16] *Zuniga*, 2018 WL 2711145, at *4. Appellant's Issues One through Four are overruled.

## ISSUE SEVEN: APPELLANT'S FIRST AMENDMENT RIGHTS WERE NOT VIOLATED

In Issue Seven, Appellant raises a related argument, contending that by interpreting the Penal Code provision as merely requiring the State to allege and prove that an individual committed a predicate offense "as a member of a criminal street gang," this allows the State to prosecute defendants based solely on their status as gang members. Appellant then argues that an individual may not be prosecuted and/or punished solely due to his "status" as a gang member,

---

[16] In Issue Two in his brief, Appellant contends that because the jury charge did not adequately define the offense by leaving out the intent element, it is impossible for this Court to conduct a sufficiency review, thereby entitling him to a new trial. Because we conclude that the jury charge was accurate, we need not address this issue. We do note, however, that contrary to Appellant's belief, even if the jury charge had not been accurate, we would have been able to review the sufficiency of the evidence under a hypothetically correct jury charge, setting forth the correct elements of the offense. *Zuniga*, 2018 WL 2711145, at *3 (recognizing that an appellate court considers the sufficiency of the evidence under a hypothetically correct jury charge).

14

asserting that doing so would violate his First Amendment right to associate freely with a group of his own choosing. In support of this argument, Appellant cites a series of United States Supreme Court cases that afford First Amendment protection to individuals associating with others holding similar beliefs even when the associated group has a propensity for committing violent acts. *See Aptheker v. Sec'y of State*, 378 U.S. 500, 514, 84 S.Ct. 1659, 1668, 12 L.Ed.2d 992 (1964) (concluding that the section of the Subversive Activities Control Act, which made it a felony for a member of a Communist organization to apply for, use or attempt to use a passport, was unconstitutional on its face); *Coates v. City of Cincinnati*, 402 U.S. 611, 615, 91 S.Ct. 1686, 1689, 29 L.Ed.2d 214 (1971) (statute that made it criminal for individuals to assemble on the streets in such a manner as to "annoy" those passing by was unconstitutional as the "First and Fourteenth Amendments do not permit a State to make criminal the exercise of the right of assembly simply because its exercise may be 'annoying' to some people"); *see also Dawson v. Delaware,* 503 U.S. 159, 165-66, 112 S.Ct. 1093, 1097-98, 117 L.Ed.2d 309 (1992) (holding that evidence of a defendant's membership in a white racist prison gang, as well as evidence of the gang's propensity for violence and racism, was not admissible during the punishment phase of the defendant's trial, where his membership was not relevant to the offense for which he had been tried and convicted).

Although the State concedes the point that an individual may not be prosecuted based solely on his membership in a gang, the State correctly points out that the statute itself does not support a prosecution on gang membership alone. Instead, as explained in *Zuniga*, section 71.02 of the Penal Code requires the State to allege and prove not only that a defendant was a member of a criminal street gang, but that the defendant committed an underlying predicate offense "as a member of a criminal street gang." *Zuniga*, 2018 WL 2711145, at *4. Further, as set forth above,

15

the Court interpreted the phrase "as a member of a criminal street gang," as requiring the State to come forward with evidence that the defendant was acting "[i]n the role, capacity, or function of" a gang member at the time he committed the underlying offense. Therefore, more than mere membership, the offense requires a nexus or causal relationship between the commission of the underlying offense and the defendant's gang membership. *Id.,* at *4, 7. Because there is no danger that an individual will be prosecuted or convicted based solely on his status as a member of a gang, we conclude that the prosecution under the statute did not impinge on Appellant's First Amendment right to associate or to join groups of his own choosing.[17] Appellant's Issue Seven is overruled.

## ISSUES FIVE AND NINE:   THE SUFFICIENCY OF THE EVIDENCE

In Issues Five and Nine, Appellant contends that the evidence presented at his trial was not legally sufficient to support the jury's verdict finding him guilty of engaging in organized criminal activity. We disagree.

### Standard of Review

---

[17] In his reply brief, Appellant argues for the first time that the Penal Code provision defining the crime of engaging in organized criminal activity is unconstitutional, both on its face and as applied, in violation of the "United States Supreme Court's vagueness and overbreadth doctrines." Rule 38.3 of the Texas Rules of Appellate Procedure restricts a reply brief to addressing matters raised in the appellee's brief, and therefore, a reply brief may not be utilized to present a new issue to the court. *In Interest of M.D.G.,* 527 S.W.3d 299, 302-303 (Tex.App.--El Paso 2017, no pet.) (citing TEX.R.APP.P. 38.3; *Calvillo v. Carrington Mortgage Services*, 487 S.W.3d 626, 630 n.2 (Tex.App.--El Paso 2015, pet. denied)); *see also Fox v. City of El Paso*, 292 S.W.3d 247, 249 (Tex.App.--El Paso 2009, pet. denied). We also note that Appellant has failed to specify exactly what terms he believes are undefined or suffer from any unconstitutional vagueness, and he has therefore failed to adequately brief the issue for our review. TEX.R.APP.P. 38.1 (the brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record); *see also Williamson v. Howard*, _____ S.W.3d _____, No. 08-13-00309-CV, 2018 WL 636405, at *9 (Tex.App.--El Paso Jan. 31, 2018, no pet.) (finding briefing waiver where appellant failed to adequately present a clear, concise, and applicable argument with appropriate and applicable authority with citations); *Sweed v. City of El Paso,* 195 S.W.3d 784, 786 (Tex.App.--El Paso 2006, no pet.) (finding that appellant's brief did not comply with the rules of appellate procedure where his issues were minimally briefed and did not set forth any basis for reversal of the trial court's decision). We therefore decline to address this additional attack on the constitutionality of the statute.

In conducting our legal sufficiency review, we examine all of the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime as alleged in the application paragraph of the charge to the jury beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Dewberry v. State,* 4 S.W.3d 735, 740 (Tex.Crim.App. 1999). We do not reexamine the evidence and impose our own judgment as to whether the evidence establishes guilt beyond a reasonable doubt, but determine only if the findings by the trier of fact are rational. *See Lyon v. State,* 885 S.W.2d 506, 516–17 (Tex.App.--El Paso 1994, pet. ref'd).

The fact finder is the exclusive judge of the credibility of witnesses and of the weight to be given to their testimony. *Lancon v. State,* 253 S.W.3d 699, 707 (Tex.Crim.App. 2008). Therefore, we do not resolve any conflicts of fact or assign credibility to the witnesses. *See id.*; *Adelman v. State,* 828 S.W.2d 418, 421 (Tex.Crim.App. 1992); *Matson v. State,* 819 S.W.2d 839, 843 (Tex.Crim.App. 1991); *Belton v. State,* 900 S.W.2d 886, 897 (Tex.App.--El Paso 1995, pet. ref'd). We presume the fact finder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Dobbs v. State,* 434 S.W.3d 166, 170 (Tex.Crim.App. 2014). On appeal, the same standard of review is used for both circumstantial and direct evidence cases. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007); *see also Kuciemba v. State,* 310 S.W.3d 460, 462 (Tex.Crim.App. 2010); *Powell v. State,* 194 S.W.3d 503, 506 (Tex.Crim.App. 2006); *Viscaino v. State*, 513 S.W.3d 802, 807 (Tex.App.--El Paso 2017, no pet.).

**Analysis**

Appellant raises at least three separate arguments in support of his contention that the evidence was not sufficient to support his conviction, which we review separately.

17

## Evidence of Involvement in a Predicate Crime

First, Appellant argues that there was insufficient evidence to demonstrate that he was involved in the predicate murders, as there was no direct evidence or "eyewitness" testimony placing him at the scene of the crime. We note, however, that direct evidence of a defendant's guilt is not necessary to support a criminal conviction; instead, as the Court of Criminal Appeals has recognized, "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper*, 214 S.W.3d at 13 (citing *Guevara v. State,* 152 S.W.3d 45, 49 (Tex.Crim.App. 2004)).

In the present case, the most incriminating evidence came from the testimony of Irma Lara, who testified that Appellant left their house to attend a "meeting" with other gang members, and when he returned he nervously told her "[w]e had to kill Chuco [Fierro] and the kid [Renteria]." Appellant, however, argues that Lara's testimony did not sufficiently link him to the murders. In part, Appellant's argument appears to be based on a response Lara gave at trial in which she stated that when Appellant returned to their home on the day of the murders, he told her that "him and Garfield shot Chavalon [Renteria] and then Wicked and Kiddo shot Chuco [Fierro]." Appellant contends that Lara's use of "him," in her response can only be interpreted to mean that Renteria was shot by Garfield and a third person, i.e., not Appellant. For the following reasons, we are not persuaded.

First, when ambiguities and/or conflicts arise in testimony, a jury may resolve the circumanstance in a manner it deems reasonable. Thus, when Lara used the term "him" rather than "he," the jury could reasonably conclude that Appellant was referring to himself as he described the shooting of Renteria; and, on appeal, we must defer to that resolution in conducting

18

our sufficiency review. *See, e.g.*, *Smith v. State*, 340 S.W.3d 41, 48-49 (Tex.App.--Houston [1st Dist.] 2011, no pet.) (the jury could have reasonably reconciled an ambiguity in witness's testimony in such a way as to support its guilty verdict); *see also Queeman v. State*, 520 S.W.3d 616, 622 (Tex.Crim.App. 2017) (reviewing court must presume that the jury resolved any such conflicts in favor of the verdict).

Second, we also note that the jury was instructed that Appellant could have been found guilty of engaging in organized criminal activity with regard to Renteria's murder under the law of parties' doctrine even if he did not act alone in shooting Renteria. As the charge instructed, if the evidence demonstrated that he acted with the "intent to promote or assist [his] co-defendants, and solicited, encouraged, directed, aided or attempted to aid the co-defendants as a member of a criminal street gang, to commit the murder," the jury could reach a finding of guilt. The "law of parties" doctrine is set forth in section 7.02 of the Texas Penal Code, which provides that an individual may be found criminally responsible for an offense committed by another if, while acting with the "intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense[.]" *See* TEX. PENAL CODE ANN. § 7.02(a)(2) (West 2011); *see also* TEX. PENAL CODE ANN. § 7.01 (West 2011) (a person is a criminally responsible party to an offense "if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both"); *see also Romero v. State*, No. 08-10-00074-CR, 2012 WL 3834917, at *4 (Tex.App.--El Paso Sept. 5, 2012, pet. ref'd) (not designated for publication) (discussing law of parties' doctrine).

Here, Lara's testimony included Appellant's admission that he was present at the scene with other gang members when Fierro and Renteria were shot and killed. Lara testified that

Appellant explained they were killed "because Chuco [Fierro] and Vero [Cera] turned in Nano [Zuniga]." Moreover, Appellant told Lara that Renteria was killed because "[h]e was just there like a witness, kind of." As well, the State presented evidence that data from Appellant's cell phone placed him at the scene of the murders.

Given the evidence presented, we conclude it was sufficient to allow the jury to reasonably infer that Appellant was present at the scene of Renteria's murder, and that he actively participated in the murder—whether by actually shooting Renteria or by assisting or encouraging others to do so. *See generally Webb v. State*, No. 08-11-00126-CR, 2013 WL 1229012, at \*5–6 (Tex.App.--El Paso Mar. 27, 2013, pet. ref'd) (not designated for publication) (despite appellant's contention that he did not participate in the predicate offense of aggravated robbery, the circumstantial evidence was sufficient to allow a jury to infer that appellant, who admitted to being a member of a criminal street gang, participated with other gang members in committing the predicate offense).

We therefore conclude that the State presented sufficient evidence to link Appellant to the predicate offense of murder.

### The Nexus between the Predicate Offense and Membership in a Street Gang

Appellant also contends that even if the evidence linked him to the murders, there was "no evidence" to support a finding that Renteria's murder was committed with the intent to participate as a member of a criminal street gang, or that his murder had anything to do with gang activities. As explained above, in accordance with the holding in *Zuniga*, the State was not required to establish that Appellant acted with the intent to participate as a member of a criminal street gang. *Zuniga*, 2018 WL 2711145, at \*4. Nevertheless, the Court in *Zuniga* did conclude that there must be a nexus between a defendant's commission of the predicate offense and his gang membership,

20

or in other words, there must be evidence that the defendant was acting "[i]n the role, capacity, or function of" a gang member at the time of the offense. *Id*., at *4, 7. We therefore review the evidence under that standard.

As set forth above, the undisputed evidence at trial established that Appellant and the other individuals involved in committing the murders were all members of the Barrio Azteca gang. Further, Appellant himself testified at trial that the murders resulted from an inner struggle between Barrio Azteca gang members over control of the gang's leadership. Appellant described a "rift" between victim Fierro and two others, Noriega and Cornejo. Moreover, as set forth above, there was also evidence that Fierro had been "green-lighted" by another high-ranking gang member, i.e., designated to be executed, due to the gang's belief that Fierro and his wife were "snitches," and that this was the reason for Fierro's murder. As well, Lara's testimony established that Appellant left the house with two other gang members for a "meeting," and returned to report that the execution had in fact been accomplished.

Accordingly, the jury could have reasonably inferred that Appellant accompanied the other gang members to the scene of the murders, in his capacity as a member of the Barrio Azteca gang, for the purpose of carrying out the execution orders against Fierro.[18] Accordingly, while Renteria's death was an unfortunate result of his decision to accompany Fierro, there was ample evidence to support a conclusion that the murders of both Fierro and Renteria were in fact gang-

---

[18] In his brief, however, Appellant finds it significant that Fierro was a higher-ranking member of the gang than he was, and that Fierro's murder—by a lower-level member—would have violated the Barrio Azteca's rules; Appellant asserts that this alleged rule violation somehow established that the murders were not gang-related. Aside from the fact that the evidence indicated that an even higher-ranking gang member had ordered Fierro's execution, we fail to understand how a murder of this nature, i.e., a murder resulting from what Appellant himself described as a "rift" within the gang's membership, could not be considered gang-related—whether it was authorized by the gang's rules or not.

related. We therefore conclude that there was a sufficient nexus between the predicate murder and Appellant's gang membership to sustain his conviction for the charge of engaging in organized criminal activity.

## Direct Evidence of Motive not Required

And finally, Appellant contends that although there was evidence that the Barrio Azteca gang may have had a motive to murder Fierro, there was no evidence that Appellant himself had a personal "motive" or had a "bone to pick" with Fierro. Although a motive can be relevant as circumstantial evidence tending to prove guilt, we note the existence of a "motive" is not an element of the offense of murder, and therefore, the State need not present direct evidence of motive to sustain a conviction. *See generally Clayton v. State,* 235 S.W.3d 772, 781 (Tex.Crim.App. 2007) (recognizing that although motive is not an element of murder, it may be a circumstance that is indicative of guilt); *see also Bush v. State,* 628 S.W.2d 441, 444 (Tex.Crim.App. 1982); *Molina v. State*, No. 08-07-00242-CR, 2009 WL 2623364, at *3 (Tex.App.--El Paso Aug. 26, 2009, no pet.) (not designated for publication).

Moreover, in *Zuniga*, the Court of Criminal Appeals expressly held that in prosecutions for engaging in organized criminal activity, the State need not provide direct or affirmative evidence that a defendant's "motive" for committing and/or participating in a predicate offense was gang-related, "as opposed to some other reason independent of his gang membership." *Zuniga,* 2018 WL 2711145, at *7. In other words, the statute does not "require proof of the gang member's particular motivation for committing an offense." *Id*. Instead, as set forth above, the Court held that the statute only requires proof that the defendant engaged in the underlying offense "as a member of a criminal street gang," in the sense that he was acting pursuant to his role or capacity

22

as a gang member at the time that he committed the offense. *Id.* (citing TEX. PENAL CODE ANN. § 71.02(a)).

As set forth above, the evidence was sufficient to support a finding that Appellant was acting in his capacity as a gang member at the time he committed the predicate offense of Renteria's murder. Accordingly, we conclude that the evidence was sufficient to support Appellant's conviction for engaging in organized criminal activity. *See id.*, at *4. Appellant's Issues Five and Nine are overruled.

## ISSUE SIX: THE JURY QUESTIONS

In Issue Six, Appellant contends that the trial court failed to follow the proper statutory procedures set forth in the Texas Code of Criminal Procedure for responding to a set of questions the jury sent to the trial court during its deliberations in which it asked to have certain testimony read back to it. The State, on the other hand, contends that Appellant failed to preserve this issue for our review by failing to object to the procedure used by the trial court in response to the jury's questions, and by instead actually consenting to it. The State further contends that even if Appellant did not waive his right to raise this issue, the procedure followed by the trial court did not constitute reversible error. Appellant, however, contends that he did not "expressly relinquish" his right to have the proper procedure followed by failing to object, and further asserts that the procedure followed by the trial court caused substantial harm to his case, and therefore, constituted reversible error "because the jury never got answers to [its] questions[.]" We agree with the State on this issue.

### The Jury's Questions

23

On the afternoon of the first day of its deliberations, the jury sent a note to the trial court in which it requested a "transcription" of two days of trial testimony, and in particular, requested the testimony of Appellant, Lara, and Cera. The trial court sent a written response to the jury that same day, advising it of the proper procedure to be followed in order to have specific testimony read back to them, as follows:

> The Court cannot have the court reporter read back the testimony of the witnesses you have requested. To request that testimony be read back to you, you must follow these rules: The court will allow testimony to be read back to the jury only if the jury, in a writing signed by the foreperson, (1) states that it is requesting that testimony be read back, (2) states that it has a disagreement about a specific statement of a witness or a particular point in dispute, and (3) identifies the name of the witness who made the statement. The court will then have the court reporter read back only that part of the statement that is in disagreement.[19]

The next morning at 9:45 a.m., the jury sent a written communication to the trial court indicating that the jurors had various disputes regarding the testimony of several witnesses, and had questions primarily relating to when the witnesses reported that certain events occurred.[20] The jury also asked a general question regarding Lara's testimony pertaining to the statements that Appellant made to her on the day of the murders.

In response, the trial court called a hearing on the record with both attorneys present, and advised them that the jury had sent out a number of questions "on disputes in the testimony." After ascertaining that both attorneys had been given an opportunity to "study those question[s],"

---

[19] Appellant did not object to this note in the trial court, and on appeal, he does not appear to have any issue with the manner in which the trial court responded to the first note sent by the jury.

[20] Among other things, the jury had questions about what time Fierro reportedly received the letter from Tolon; what time Cera said that Fierro called Appellant; what time Cera said she saw Fierro leave the house with Renteria; what time Lara said Appellant received the phone call from Fierro; what time Lara said Appellant left the house to meet with the other gang members, and what time he returned home; what time Lara said she and Appellant left for the party; what time the victims' bodies were found; the date on which Appellant was arrested; and the date on which Lara gave her statement to the police.

24

the trial court suggested that rather than having to "go through a long string of read backs" of the disputed testimony, the attorneys could instead "go through those questions and then argue their side of that way" they believed the questions should be answered. Both attorneys expressly agreed to that procedure on the record, and the trial court gave them each 15 minutes to address the jury's questions. During his 15 minutes, defense counsel addressed various timing issues, and also took the opportunity to essentially reargue the case and to attack the strength of the State's evidence. The State, on the other hand, spent most of its time reiterating its theory of guilt, and eventually addressed the timeline of when the events in question occurred. The jury did not indicate that it was dissatisfied with this procedure or that it had any additional questions, and thereafter returned to its deliberations. Later that same day, the jury sent a note indicating that it had come to a verdict.

## Applicable Law

There are two provisions in the Texas Code of Criminal Procedure that set forth the procedures to be used when a jury in a criminal case has a question for the trial court. First, Article 36.27 of the Code provides that upon receiving a written communication from the jury, the trial court must first use reasonable diligence to secure the presence of the defendant and his counsel to provide them with the jury's questions, as well as the trial court's proposed answer to the jury, to allow for any objections or exceptions. *See* TEX.CODE CRIM.PROC.ANN. art. 36.27 (West 2006); *see also Edwards v. State* 558 S.W.2d 452, 454 (Tex.Crim.App. 1977) (the purpose of Article 36.27 is to afford a defendant and his attorney an opportunity to examine the questions and to urge objections, if any, to the additional instructions or answers to be given to the jury). The Code further provides that the trial court shall thereafter provide its answer to the jury in

25

writing and read the answer in open court unless expressly waived by the defendant. TEX.CODE CRIM.PROC.ANN. art. 36.27.

Article 36.28 provides a more specific procedure to be used when the jury has a disagreement over the testimony given by a witness. TEX.CODE CRIM.PROC.ANN. art. 36.28 (West 2006). In that instance, the trial court may direct the jury to advise it of the exact nature of its disagreement, so that the trial court will know what testimony is in dispute, and can have that portion of the testimony read back to the jury from the court reporter's notes.[21] *Id*. art. 36.28; *see also Howell v. State*, 175 S.W.3d 786, 792 (Tex.Crim.App. 2005) (trial judge properly required the jury to specify the nature of its dispute over a witness's testimony, and to specify what testimony it wanted read back); *Moore v. State*, 874 S.W.2d 671, 673 (Tex.Crim.App. 1994) (recognizing that jury must indicate its disagreement as to the statement of a witness in order to have the testimony in dispute read to the jury). This statute "seeks to balance the concern that the trial court not comment on the evidence with the need to provide the jury with the means to resolve any factual disputes it may have." *Balderas v. State,* 517 S.W.3d 756, 797 (Tex.Crim.App. 2016), *cert. denied*, 137 S.Ct. 1207 (2017) (citing *Howell v. State,* 175 S.W.3d 786, 790 (Tex.Crim.App. 2005)); *see also Thomas v. State*, 505 S.W.3d 916, 923 (Tex.Crim.App. 2016).

When a jury asks that certain testimony be re-read, the judge must first determine if the request is proper under Article 36.28. *Balderas,* 517 S.W.3d at 797 (citing *Howell*, 175 S.W.3d at 790). After making a determination, the trial court must then interpret the communication;

_____

[21] In the alternative, the Code provides that if the court reporter's notes of a witness's testimony are not available, the trial judge "may cause such witness to be again brought upon the stand and the judge shall direct him to repeat his testimony as to the point in dispute, and no other, as nearly as he can in the language used on the trial." TEX.CODE CRIM.PROC.ANN. art. 36.28.

26

decide in its discretion what sections of the testimony will best answer the jury's query; and limit the testimony to be read back to the jury accordingly. *Id*. at 798 (citing *Iness v. State,* 606 S.W.2d 306, 314 (Tex.Crim.App. 1980)); *see also Thomas*, 505 S.W.3d at 923. An appellate court reviews a trial court's determination of whether a sufficient factual dispute exists between jurors to justify a read-back of testimony for an abuse of discretion. *See Balderas*, 517 S.W.3d at 798; *Robison v. State,* 888 S.W.2d 473, 480 (Tex.Crim.App. 1994). If the trial court determines that there is no testimony responsive to the jury's request, it is not an abuse of discretion to decline to read back a witness's testimony. *Balderas*, 517 S.W.3d at 799 (trial court did not abuse its discretion in refusing to read back a portion of a police detective's testimony where it determined that it was not responsive to the jury's questions). A trial court, however, should not exclude testimony that is directly related to the issue in dispute. *Horton v. State*, 530 S.W.3d 717, 722 (Tex.App.--Fort Worth 2017, pet. ref'd); *see also Jones v. State*, 706 S.W.2d 664, 668 (Tex.Crim.App. 1986) (holding that the trial court abused its discretion by failing to have cross-examination testimony related to the disputed issue read to the jury).

**Analysis**

In the present case, the trial court initially followed the proper procedures set forth in the Code of Criminal Procedure by requiring the jury to specify the disagreements it had with regard to the testimony, so that it could identify the relevant portions of the disputed testimony to be read back. In addition, the trial court properly called a hearing with both attorneys present to allow them to review the jury's communication and questions. Where the trial court deviated from the procedures set forth in the Code is by suggesting that the attorneys provide argument to the jury as a means of answering their questions in lieu of reading the disputed testimony back to them.

27

Although we recognize that the trial court's failure to read back disputed portions of witness testimony upon a proper request by the jury is generally considered to be an abuse of discretion, because trial counsel acquiesced in this procedure, we must determine whether Appellant waived his right to raise the issue on appeal.

### The Requirement of a Contemporaneous Objection

In general, as a prerequisite to presenting a complaint for appellate review, the record must demonstrate that the party made its complaint to the trial court by a timely request, objection, or motion, and that he did so as soon as he became aware of the error. TEX.R.APP.P. 33.1; *see Hollins v. State,* 805 S.W.2d 475, 476 (Tex.Crim.App. 1991). The purpose of requiring a timely objection in the trial court is to give the trial court an opportunity to cure its error. *Hollins,* 805 S.W.2d at 476 (citing *Anderson v. State,* 633 S.W.2d 851 (Tex.Crim.App. 1982)). A trial court's failure to follow the correct procedures under the Code of Criminal Procedure in responding to a jury's communication is an easily rectifiable or curable error, and therefore it is incumbent upon the defendant to come forth with a timely objection to the trial court's failure to follow those procedures. *See, e.g., Smith v. State*, 513 S.W.2d 823, 829 (Tex.Crim.App. 1974) (citing *Smith v. State,* 474 S.W.2d 486 (Tex.Crim.App. 1972); *Lipscomb v. State*, 467 S.W.2d 417 (Tex.Crim.App. 1971); *Verret v. State*, 470 S.W.2d 883 (Tex.Crim.App. 1971); *Rodriquez v. State*, 500 S.W.2d 517 (Tex.Crim.App. 1973); *Hancock v. State*, 120 Tex.Crim. 162, 47 S.W.2d 299 (1932); *McClellan v. State*, 118 Tex.Crim. 473, 40 S.W.2d 87 (1931)). If a defendant fails to make a timely objection to a trial court's failure to follow the correct procedures in responding to a jury's communication, the error will not be preserved for appellate review. *Id*; *see also Hollins*, 805 S.W.2d at 476 (citing *Casiano v. State,* 495 S.W.2d 232 (Tex.Crim.App. 1973); *Swindell v. State,*

491 S.W.2d 400 (Tex.Crim.App. 1973); *Martin v. State,* 459 S.W.2d 845 (Tex.Crim.App. 1970); *Maldonado v. State,* 425 S.W.2d 646 (Tex.Crim.App. 1968)); *Thomas v. State*, 624 S.W.2d 296, 297 (Tex.App.--Dallas 1981, no pet.) (where record reflected that no objection was made to the trial court's failure to follow Article 36.28 in responding to a jury's communication, appellant did not preserve error for appellate court's review).

**Analysis**

Here, Appellant admittedly failed to object to the trial court's procedure in responding to the jury's questions, but nonetheless contends that we should consider this issue on appeal, because he did not "expressly" relinquish his right to have the procedures followed and because he contends the trial court's failure to follow the procedure caused him substantial harm.   As the State correctly points out, in determining whether an appellate court may consider an issue not raised in the trial court, we must first determine the category into which the alleged error falls.   In *Marin*, the Court of Criminal Appeals recognized three distinct categories of rights of a defendant: "(1) absolute requirements and prohibitions; (2) rights of litigants which must be implemented by the system unless expressly waived; and (3) rights of litigants which are to be implemented upon request." *See Marin v. State,* 851 S.W.2d 275, 279 (Tex.Crim.App. 1993).   Appellant appears to believe that the trial court's failure to follow the correct procedures under the Code falls into the second category of rights, asserting that he never "expressly relinquish[]" his rights under the applicable Code provisions.   There are several problems with this argument.

First, Appellant not only failed to object to the trial court's procedures, he acquiesced in the very procedures that he now seeks to challenge. As such, even if we were to consider that the right to have the disputed testimony read back to the jury fell within the second category of rights,

29

we would consider Appellant's agreement with the trial court's decision to follow a different procedure to have been an express relinquishment or waiver of the right. *See generally Heller v. State*, 279 S.W.3d 823, 825 (Tex.App.--Amarillo 2008, no pet.) (where defendant agreed to trial court's planned course of action in responding to jury note, appellant's issue claiming that this procedure was in error presented nothing for the court's review); *Revell v. State*, 885 S.W.2d 206, 211-12 (Tex.App.--Dallas 1994, pet. ref'd) (holding that because the defendant did not object to the trial court's oral communication with the jury, and instead encouraged the trial court to so communicate orally, he waived any error regarding any violation of Article 36.27 that he partially induced).

Second, as the State points out, virtually every court considering the issue after *Marin* was decided has concluded that a defendant is required to make a timely objection to a trial court's failure to follow the statutory procedures in responding to a jury question, thereby suggesting that the right to have testimony read back to the jury falls within the third category of rights that must be implemented upon request. *See, e.g., Thomas v. State*, 505 S.W.3d 916, 924 (Tex.Crim.App. 2016) (recognizing that a defendant must preserve error by making a timely objection to the manner in which the trial court responds to a jury's request to read back testimony); *Word v. State*, 206 S.W.3d 646, 652 (Tex.Crim.App. 2006) (noting its agreement with the long-standing rule that a defendant must preserve error by making a timely objection to the trial court's failure to follow the correct statutory procedures in responding to a jury communication); *see also Carr v. State,* No. 05-02-01747-CR, 2003 WL 22456355, at *1 (Tex.App.--Dallas, Oct. 30, 2003, pet. ref'd) (mem. op.) (not designated for publication) (recognizing that a defendant must object to deviations from article 36.27 in order to preserve any complaint for appellate review); *Boatwright v. State,*

30

933 S.W.2d 309, 310–11 (Tex.App.--Houston [14th Dist.] 1996, no pet.) (holding that appellant failed to properly preserve asserted error with regard to the trial court's alleged noncompliance with Articles 36.27 and 36.28, where appellant failed to either object or file a formal bill of exception once he learned of the noncompliance); *see generally Marin*, 851 S.W.2d at 278-79 (noting that the vast majority of evidentiary and procedural rules and rights fall under the third category, such that they must be implemented only upon the defendant's request or objection).

Accordingly, we conclude that by failing to object to the trial court's failure to follow the statutory procedures in responding to the jury's questions, and by instead acquiescing in its decision to deviate from those procedures, Appellant failed to preserve his right to complain about this issue on appeal. Appellant's Issue Six is overruled.

### ISSUE EIGHT: THE SPOUSAL PRIVILEGE ISSUE

In Issue Eight, Appellant contends that the trial court erred when it ruled that Irma Lara was not Appellant's common-law wife, and that the spousal privilege did not bar her from being called as a witness by the State to testify against him at trial. Appellant further contends that the trial court should have submitted the question of whether a common-law marriage existed to the jury, and that it erred by failing to do so. The State counters that the record contains conflicting evidence on the issue of whether Lara and Appellant were in a common-law marriage, and that the trial court therefore did not abuse its discretion in finding the spousal privilege did not apply. The State further contends that this was an issue for the trial court to decide and not for the jury.

### Applicable Law

The spouse of an accused in a criminal case has a privilege not to be called as a witness for the State, but may testify at an accused's trial voluntarily. TEX.R.EVID. 504(b)(1); *see also Jasper*

*v. State*, 61 S.W.3d 413, 418 (Tex.Crim.App. 2001); *Colburn v. State,* 966 S.W.2d 511, 514 (Tex.Crim.App. 1998). In the absence of a formal, ceremonial marriage, the party asserting the privilege must prove the existence of an informal or common-law marriage at the relevant time period, i.e., the time of any communications related to the crime, and must do so by a preponderance of the evidence. *Colburn*, 966 S.W.2d at 514 (citing *Welch v. State,* 908 S.W.2d 258, 264–265 (Tex.App.--El Paso 1995, no pet.)); *see also Douglas v. State*, 489 S.W.3d 613, 628 (Tex.App.--Texarkana 2016, no pet.); *Hightower v. State*, 629 S.W.2d 920, 924 (Tex.Crim.App. 1981). The existence of an informal marriage may be proven in a judicial proceeding in one of two ways. *Jasper*, 61 S.W.3d at 419. First, there can be a showing that a written declaration of marriage has been signed by the parties. *Id*. If there is no signed declaration, there must be evidence that (1) the couple agreed to be married, (2) then lived together in Texas as husband and wife, (3) while representing to others that they were married. *Id*. (citing TEX.FAM.CODE ANN. § 2.401(a)(1)(2) (Vernon 1998)); *see also In Interest of C.M.V.,* 479 S.W.3d 352, 359–60 (Tex.App.--El Paso 2015, no pet.); *Russell v. Russell,* 865 S.W.2d 929, 932 (Tex. 1993); *Tompkins v. State,* 774 S.W.2d 195, 208 (Tex.Crim.App. 1987). All three elements must be present in order to establish the existence of a common-law marriage. *C.M.V.*, 479 S.W.3d at 360 (citing *Burden v. Burden,* 420 S.W.3d 305, 308 (Tex.App.--Texarkana 2013, no pet.); *Eris v. Phares,* 39 S.W.3d 708, 714 (Tex.App.--Houston [1st Dist.] 2001, pet. denied)).

To establish that the parties agreed to be in a common-law marriage, the party asserting the privilege has the burden of proving that the couple intended to create an immediate and permanent marriage relationship, not merely a temporary cohabitation that could be ended by either party. *C.M.V.*, 479 S.W.3d at 360. Further, the agreement must have been to be "presently" married,

32

not to marry sometime in the future. *Colburn*, 966 S.W.2d at 515. The agreement to be married may be established by either direct or circumstantial evidence, but the agreement cannot be inferred from the mere evidence of cohabitation and representations of marriage to others. *Id.* The testimony of one of the parties to a purported informal marriage that such an agreement exists constitutes some direct evidence that the parties agreed to be married. *See Small v. McMaster,* 352 S.W.3d 280, 283 (Tex.App.--Houston [14th Dist.] 2011, pet. denied).

To satisfy the requirement that the couple represented to others that they were married, there must be evidence that the couple had a reputation in the community for being married. *Id.* at 284–85 (citing *Eris,* 39 S.W.3d at 715). Proving a reputation for being married requires evidence that the couple "consistently conducted themselves as husband and wife in the public eye or that the community viewed them as married." *Id.* at 285. Occasional references to each other as husband and wife are not sufficient to establish this requirement. *Id.*; *see also Lee v. Lee,* 981 S.W.2d 903, 907 (Tex.App.--Houston [1st Dist.] 1998, no pet.) (occasional introductions as husband and wife are not sufficient to establish the element of holding out); *Ex parte Threet,* 160 Tex. 482, 333 S.W.2d 361, 364 (1960) (evidence that couple was introduced as husband and wife to a few friends was no evidence that they held themselves out as married). Further, conclusory testimony that a common-law marriage existed or that the parties held themselves out as married is not sufficient by itself. *Tompkins,* 774 S.W.2d at 209.

### Standard of Review

In reviewing the trial court's ruling on whether a spousal privilege exists, as with other questions concerning the admissibility of evidence, we apply an abuse of discretion standard. *See Colburn,* 966 S.W.2d at 514 (citing TEX.R.CRIM.EVID. 104(a); *see also McVickers v. State,* 874

33

S.W.2d 662, 664 (Tex.Crim.App. 1993)). The trial court is afforded broad discretion in the determination of such questions, and its ruling will not be reversed absent an abuse of discretion. *Welch v. State*, 908 S.W.2d 258, 264–65 (Tex.App.--El Paso 1995, no pet.) (citing *McVickers,* 874 S.W.2d at 664; *Werner,* 711 S.W.2d at 643); *see also Carmona v. State,* 947 S.W.2d 661, 664 (Tex.App.--Austin 1997, no pet.) (appellate court reviews the denial of husband-wife privilege for an abuse of discretion). An abuse of discretion occurs when the trial court's decision is so clearly wrong as to lie outside the zone of reasonable disagreement. *See Zuliani v. State,* 97 S.W.3d 589, 595 (Tex.Crim.App. 2003). Further, as recognized by the Court of Criminal Appeals, when a trial court's decision denying a claim of spousal privilege centers on its evaluation of the witnesses' credibility and demeanor, appellate courts should afford almost total deference to the trial court's finding of fact and view the evidence in the light most favorable to the trial court's ruling. *Jasper*, 61 S.W.3d at 419. However, to the extent that the trial court's decision did not turn on an evaluation of credibility and demeanor, then an appellate court may review the trial court's decision de novo. *Id.*

### The Evidence

Prior to trial, Irma Lara filed a motion contending she was Appellant's common-law wife, and asserting the spousal privilege barred her from testifying against him at trial. In support of her motion, Lara attached an affidavit asserting that she had lived with Appellant since November of 2008, until the date of his arrest, and that she had "told everybody [that she and Appellant] were married to each other."

The trial court held a hearing on the motion, at which Lara testified that she and Appellant had been living together on a nearly-continuous basis since November of 2008. She also testified

34

that she and Appellant had an "agreement" that they were married during that time, and in her mind, they were in a "common-law" marriage. As well, Lara testified that the two of them represented to others that they were married. As an example, Lara testified that the two of them purchased property together, including a vehicle, as husband and wife, and that they were on a lease together as husband and wife. However, Lara was unable to produce any documentary evidence of the vehicle purchase or the lease. The only other witness to testify at the hearing in favor of the privilege was Jennifer Robledo, the common-law wife of Lara's brother, who testified that Lara had told her that Appellant was her husband.

In contrast, the State presented evidence that both Appellant and Lara had identified themselves as being "single" on various applications to receive government benefits during the period in which they cohabitated. In addition, the State introduced into evidence a statement that Lara gave to police after the murders occurred, in which she identified Appellant as her "boyfriend" and that they had been "dating" during the years prior to the offense. The State also questioned Lara about testimony she provided in another criminal proceeding in which she similarly described Appellant as her "boyfriend."

As well, the State presented a series of booking records in which Appellant identified himself as being single during the relevant time period, and one in which he identified Lara as his "girlfriend." The State also presented a booking record from 1992, after Appellant was arrested on an unrelated offense, in which he identified another woman, Veronica Flores, as being his "common-law wife." The State argued that this demonstrated that Appellant understood the concept of common-law marriages, pointing out that he could have, but did not, similarly list Lara

35

as being his common-law wife. As well, the State argued that there was no evidence presented that Appellant and Flores had ever gotten divorced. [22]

Following the hearing, the trial court noted that the parties had come forward with conflicting evidence on the question of whether Appellant and Lara were in a common-law marriage. However, the trial court concluded that the evidence presented was not sufficient to establish the existence of a common-law marriage, and that the spousal privilege therefore did not apply to bar the State from calling Lara as a witness.

**Analysis**

Viewing the evidence in the light most favorable to the trial court's ruling, we cannot conclude that the court abused its discretion in reaching the decision that a common-law marriage did not exist. As the trial court recognized, although Lara did present some evidence at the hearing that she and Appellant had an agreement to be married and that they held themselves out to at least one family member as being married, there was no evidence that they did so on a regular basis or in a public manner, and Lara's testimony was conclusory at best. Moreover, the State presented evidence that Lara had repeatedly referred to Appellant as her "boyfriend" in public documents, and that Appellant had similarly referred to Lara as his "girlfriend."[23] Therefore, the trial court had the discretion to disbelieve Lara's testimony that the couple had an agreement to be married and/or that they held each other out as such, and to therefore decide against the existence

---

[22] The State also presented evidence, including transcripts of recordings of jail phone calls that Appellant had with his mother, in which he told his mother that his trial attorney intended to claim that Lara was his common-law wife so that she could not be compelled to testify against him.

[23] The State also points out that at trial, Appellant himself referred to Lara as his girlfriend, before catching himself and calling her his wife in the following statement: "I was staying at the house. Me and my girlfriend, Irma – my wife – we were getting ready to go to a party."

36

of a common-law marriage.  *See, e.g., Jasper,* 61 S.W.3d at 419-420 (trial court had the discretion to disbelieve the testimony that the defendant was in a common-law marriage with a witness, where the State presented evidence that the defendant had referred to the witness as his girlfriend in the past).

And finally, Appellant argues, without citation to authority, that the trial court was required to present the question of whether he and Lara were in a common-law marriage to the jury, and that the trial court "usurped the role of the jury in making this decision[.]"  We note, however, that the Texas Rules of Evidence provide that a trial court "must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible."  TEX.R.EVID 104; *McDuffie v. State,* 854 S.W.2d 195, 212–13 (Tex.App.--Beaumont 1993, pet. ref'd) (noting that the rules of evidence provide that a trial court shall determine preliminary questions regarding the existence of a privilege) (citing *Casillas v. State,* 733 S.W.2d 158, 168 (Tex.Crim.App. 1986)); *see also Davis v. State,* No. 12-05-00184-CR, 2006 WL 1791654, at *3 (Tex.App.--Tyler June 30, 2006, no pet.) (mem. op.) (not designated for publication) (recognizing that Rule 104(a) provides that preliminary questions regarding the existence of a privilege are determined by the trial court); *see also Colburn,* 966 S.W.2d at 515 (upholding trial court's decision that the defendant was not in a common-law marriage and that the spousal privilege therefore did not apply).  Therefore, the question of whether Lara could assert the marital privilege was a preliminary matter for determination by the trial court, and not the jury.

Finally, we additionally note, Appellant never requested that the question be submitted to the jury, and to the contrary, his attorney argued that the existence of the spousal privilege was to be determined by the trial court and expressly requested that the trial court rule on Lara's motion.

37

Accordingly, we conclude that Appellant waived his right to raise error on this issue on appeal. *See Barnes v. State*, No. 04-13-00346-CR, 2014 WL 6979529, at *7 (Tex.App.--San Antonio Dec. 10, 2014, pet. ref'd) (citing *Aguilar v. State,* 715 S.W.2d 645, 647 (Tex.Crim.App. 1986) (the right to have the issue of the existence of a common-law marriage submitted to the jury "may be waived if such an instruction is not requested")); *see also Hightower v. State*, 629 S.W.2d 920, 924 (Tex.Crim.App. 1981) (finding that appellant's failure to complain that the issue of a common-law marriage was not submitted to the jury, or to request that it be submitted, waived the error he now seeks to present on appeal). Appellant's Issue Eight is overruled.

## II.

In response to our order dated August 17, 2016, the trial court certified Appellant's right to appeal in this case, but the certification does not bear Appellant's signature indicating that he was informed of his rights to appeal and to file a pro se petition for discretionary review with the Texas Court of Criminal Appeals. *See* TEX.R.APP.P. 25.2(d). The certification is defective, and has not been corrected by Appellant's attorney, or the trial court. To remedy this defect, this Court ORDERS Appellant's attorney, pursuant to TEX.R.APP.P. 48.4, to send Appellant a copy of this opinion and this Court's judgment, to notify Appellant of his right to file a pro se petition for discretionary review, and to inform Appellant of the applicable deadlines. *See* TEX.R.APP.P. 48.4, 68. Appellant's attorney is further ORDERED, to comply with all of the requirements of TEX.R.APP.P. 48.4.

## CONCLUSION

We affirm.

GINA M. PALAFOX, Justice

July 11, 2018

Before McClure, C.J., Rodriguez, and Palafox, JJ.

(Do Not Publish)