

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

§

IN THE INTEREST

§

OF C. M. V., A CHILD

§

§

§

§

No. 08-13-00146-CV

Appeal from the

383rd Judicial District Court

of El Paso County, Texas

(TC# 2011AG4397)

**O P I N I O N**

Frances Yepez appeals from a judgment establishing Luis A. Castelo, Jr. as the father of

C.M.V., voiding a prior judgment changing the child's name, and awarding damages in the

amount of $50,000 to Castelo on his claim for fraud. We reverse and render in part and affirm in

part.

**FACTUAL SUMMARY**

Yepez and Castelo, who never formally married, lived together from 1996 until 1998 and

have one son, C.M.V., who was born in 1997. Castelo initially denied paternity and his name is

not listed on the child's birth certificate. Yepez filed a petition for divorce from Castelo on

July 5, 2000, alleging that the parties had entered into a common law relationship around May

1996 and ceased to live together around April 1998. The divorce petition included a suit

affecting the parent child relationship (SAPCR), identifying C.M.V. as a child of the marriage

and Yepez sought managing conservatorship. Castelo, represented by counsel, filed an answer on April 2, 2001. He denied paternity but sought no affirmative relief. Meanwhile, on August 30, 2001, while the divorce action was still pending in the 65th District Court, Yepez -- represented by different counsel -- filed a petition in the 383rd District Court to change C.M.V.'s surname to her maiden name, which we reference herein only as "V." She did not serve the petition on Castelo because she feared for her safety after a prior domestic violence incident.[1] The court entered a name-change order on September 28, 2001. Yepez subsequently filed a motion to dismiss on the grounds that she was "of the opinion that a common law marriage never existed" and she believed that Castelo was still legally married to his estranged wife.[2] The divorce action was dismissed in October 2001.

According to Yepez, after the assault hearing in November 2000, Castelo had no contact with her or their son and she raised C.M.V. alone. Castelo claimed that he tried to find Yepez and C.M.V. but he did not know where they were. He alleged that Yepez had created an environment "where [he] could not locate [C.M.V.]." He did not seek counsel, nor did he go to the police or to the Attorney General to ask for help in establishing his paternity. He did not even look in a phone book to see whether Yepez was listed. Castelo eventually stopped looking for Yepez and C.M.V. because he did not know how to find them and did not "analyze [his] resources" to figure out a way to find them beyond asking mutual friends if they knew where he could find Yepez. Yepez contradicted Castelo's assertion that she hid the child from him. From 1999 to 2002, she lived at an address known to Castelo, and after she moved from that residence, her address was listed in the phone book and on property tax records.

[1] Yepez filed a charge of domestic violence against Castelo, for which he was arrested. She attended a hearing on the assault case in November 2000.

[2] The record includes a certified copy of a final judgment entered on March 1, 1993, dissolving the marriage between Castelo and his prior wife.

Fast forward ten years. On June 14, 2011, the Texas Attorney General filed a Title IV-D petition to establish the parent-child relationship and for current and retroactive child support from Castelo.[3] Castelo filed an answer and only after DNA testing did he finally admit paternity. He alleged as a defense to the request for retroactive child support that Yepez had hidden the child from him. Castelo also sought a declaratory judgment that he and Yepez had a common law marriage. Castelo asked the court, after establishing paternity, to confirm the child's surname as Castelo and order a name change. Castelo then alleged claims against Yepez for common law fraud and intentional infliction of emotional distress stemming from her failure to notify him of C.M.V.'s location and legal status, her interference "with the right for the father to communicate with his child," and her failure to inform him of "the probability of his paternity . . . ."

Following a hearing, the trial court, on February 11, 2013, issued a judgment which:

1. established paternity;

2. found that presentment of the name change petition in cause number 2001CM1629 constituted fraud upon Castelo, the child and the court;

3. found that the judgment entered in cause number 2001CM1629 changing C.M.V.'s surname was void because Castelo had not been served with citation;

4. confirmed C.M.V.'s surname to be "Castelo;"

5. appointed Yepez and Castelo to be joint managing conservators and ordered Castelo to pay monthly child support in the amount of $592.00 per month;

6. found the retroactive child support to be $16,972.22 and ordered Castelo to pay $500.00 per month toward the retroactive child support;

7. ordered Castelo to provide medical insurance for C.M.V.;

8. found certain facts relevant to the determination of whether a common-law marriage existed, but failed to declare that one existed;

---

[3] *See* TEX.FAM.CODE ANN. § 231.001-.309 (West 2014).

-3-

9. found that Yepez committed "actual and deliberate fraud" which "resulted in harm to the child" and resulted in a misrepresentation of the child's legal status and name for more than 10 years; and

10. awarded damages to Castelo in the sum of $50,000 and ordered Yepez to pay Castelo's attorney's fees in the sum of $3,200.

The trial court denied all relief not expressly granted in its judgment. Yepez filed a motion for new trial which was overruled by operation of law.

## SETTING ASIDE THE NAME-CHANGE ORDER

In her first two issues, Yepez challenges the trial court's decision to set aside the 2001 judgment changing C.M.V.'s surname. In Issue One, she complains that the trial court acted outside of its jurisdiction by setting aside the name-change because it was a valid final order and Castelo did not file a bill of review to set it aside. In Issue Two, she further maintains that even had he filed such pleadings, the evidence is legally and factually insufficient to establish that the name-change was procured by fraud.

The name-change order was signed by a district judge on September 28, 2001. Rule 329b(f) provides:

> On expiration of the time within which the trial court has plenary power, a judgment cannot be set aside by the trial court except by bill of review for sufficient cause, filed within the time allowed by law; provided that the court may at any time correct a clerical error in the record of a judgment and render judgment *nunc pro tunc* under Rule 316, and may also sign an order declaring a previous judgment or order to be void because signed after the court's plenary power had expired.

TEX.R.CIV.P. 329b(f). When the time for appeal has expired, a bill of review proceeding is the exclusive means to set aside a judgment. *Middleton v. Murff*, 689 S.W.2d 212, 213 (Tex. 1985). A party seeking to challenge a final judgment must utilize the bill of review procedure even in a case where the judgment is void or voidable. *Id.* The only exception to the Rule 329b(f) requirement of a bill of review is a case where the court rendering the judgment had no

-4-

jurisdictional power to do so. *See Middleton*, 689 S.W.2d at 213. The Supreme Court defined "jurisdictional power" to mean "jurisdiction over the subject matter, the power to hear and determine cases of the general class to which the particular one belongs." *Id.*, *quoting Deen v. Kirk*, 508 S.W.2d 70, 72 (Tex. 1974).

Castelo argues that the 383rd District Court lacked jurisdiction to change the child's name because the 65th District Court was the court of continuing, exclusive jurisdiction as a result of the pending divorce action. Yepez filed the name-change petition pursuant to Sections 45.001-.005 of the Texas Family Code. *See* TEX.FAM.CODE ANN. §§ 45.001-.005 (West 2014). Section 45.002(a)(4) requires the verified petition to state whether the child is subject to the continuing, exclusive jurisdiction of a court under Chapter 155. TEX.FAM.CODE ANN. § 45.002(a)(4). Section 155.001 of the Family Code provides that: "Except as otherwise provided by this section, a court acquires continuing, exclusive jurisdiction over the matters provided for by this title in connection with a child on the rendition of a final order." TEX.FAM.CODE ANN. § 155.001(a)(West 2014). The 65th District Court did not enter a final order and dismissed the divorce action less than two weeks after the name change. Consequently it never became the court of continuing, exclusive jurisdiction. *See* TEX.FAM.CODE ANN. § 155.001(b)(1)(providing that a voluntary or involuntary dismissal of a suit affecting the parent-child relationship does not create continuing, exclusive jurisdiction).

There is also a question whether the name-change suit should have been transferred to the 65th District Court[4] but it is unnecessary to finally resolve that question because the 383rd

---

[4] Section 103.002(b) of the Family Code provides that on a showing that a suit for dissolution of the marriage of the child's parents has been filed in another court, a court in which a SAPCR is pending shall transfer the proceedings to the court where the dissolution of the marriage is pending. *See* TEX.FAM.CODE ANN. § 103.002(b)(West 2014). A name-change petition filed under Chapter 45 of the Family Code is not a SAPCR. *See* TEX.FAM.CODE ANN. § 101.031 (West 2014)(providing that the term "suit" means a suit affecting the parent child relationship); TEX.FAM.CODE ANN. § 101.032 (West 2014)(defining "suit affecting the parent child relationship").

District Court had jurisdictional power, as that phrase is used in *Middleton v. Murff*, to hear and determine a petition seeking a name change. *See* TEX.CONST. art. V, § 8; TEX.GOV'T CODE ANN. § 24.007 (West Supp. 2014). Thus, the exception in Rule 329b(f) does not apply and Castelo was required to attack the name change by means of a bill of review. Castelo did not file a bill of review and his pleadings filed in the instant case did not ask the trial court to set aside the name change. In fact, his pleadings do not refer to the 2001 judgment at all. His petition merely asked the trial court to "confirm" that C.M.V.'s surname is Castelo and to change C.M.V.'s last name if necessary. Consequently, we conclude that the trial court lacked jurisdiction to set aside the name-change judgment.[5] We sustain Issue One. Because we have sustained the first issue, it is unnecessary to address Issue Two.

## CHANGING THE CHILD'S SURNAME

In Issue Three, Yepez challenges the legal and factual sufficiency of the evidence supporting the trial court's implied finding that changing C.M.V.'s surname is in his best interest.

### *Standard of Review and Relevant Law*

A trial court's ruling on a request to change the name of a child is reviewed for an abuse of discretion. *In re H.S.B.*, 401 S.W.3d 77, 81 (Tex.App.--Houston [14th Dist.] 2011, no pet.); *In re Guthrie*, 45 S.W.3d 719, 723 (Tex.App.--Dallas 2001, pet. denied). A trial court abuses its discretion by ruling (1) arbitrarily, unreasonably, or without regard to guiding legal principles, or (2) without supporting evidence. *Ford Motor Co. v. Garcia*, 363 S.W.3d 573, 578 (Tex. 2012). In this context, challenges to the legal and factual sufficiency of the evidence are not independent

---

[5] Yepez has filed a post-submission letter advising that C.M.V. has turned eighteen and attained majority. Consequently, she argues that this point is now moot. We disagree because if the order stands, C.M.V. must expend time and money to change his name as an adult.

grounds of error but are instead relevant factors in assessing whether the trial court abused its discretion. *In re T.M.P.*, 417 S.W.3d 557, 562 (Tex.App.--El Paso 2013, no pet.).

To determine whether the trial court has abused its discretion, we engage in a two-pronged inquiry: (1) whether the trial court had sufficient information upon which to exercise its discretion; and (2) whether the trial court erred in its application of discretion. *In re T.M.P.*, 417 S.W.3d at 562. The operative inquiry in the first question is the sufficiency of the evidence. *Id.*; *In re A.B.P.*, 291 S.W.3d 91, 95 (Tex.App.--Dallas 2009, no pet.). We must then decide whether, based on the elicited evidence, the trial court made a reasonable decision. *In re T.M.P.*, 417 S.W.3d at 562.

A father does not have a constitutional right to have his children bear his last name. *Newman v. King*, 433 S.W.2d 420, 424 (Tex. 1968); *In the Interest of D.A.*, 307 S.W.3d 556, 564 (Tex.App.--Dallas 2010, no pet.); *In re Guthrie*, 45 S.W.3d 719, 723 (Tex.App.--Dallas 2001, pet. denied); *Concha v. Concha*, 808 S.W.2d 230, 232 (Tex.App.--El Paso 1991, no writ). The Texas Family Code permits a court to change the name of a child if the change is in the child's best interest. TEX.FAM.CODE ANN. § 45.004(a)(1)(West 2014). Additionally, in a case where the court has adjudicated parentage, a court may, on request of a party and for good cause shown, change the child's name. TEX.FAM.CODE ANN. § 160.636(e)(West 2014). The Dallas and Fort Worth Courts of Appeals have held that "good cause" and "best interest" are distinct concepts and a parent seeking to change a child's name under Section 160.636(e) must establish both. *In re S.M.V.*, 287 S.W.3d 435, 445 (Tex.App.--Dallas 2009, no pet.); *In re M.C.F.*, 121 S.W.3d 891, 894-95 (Tex.App.--Fort Worth 2003, no pet.). The Fourteenth Court of Appeals observed in a recent case that the best interest of a child will necessarily be considered good cause for changing a child's name. *In re H.S.B.*, 401 S.W.3d 77, 81 n.2 (Tex.App.--Houston [14th Dist.]

2011, no pet.). Consequently, it restricted its analysis to best interest and presumed that the trial court found good cause on the same ground. *In re H.S.B.*, 401 S.W.3d at 81 n.2.

In his amended answer and counterclaim, Castelo asked the trial court to change C.M.V.'s surname after establishing paternity, but he did not specify a statutory basis for his request. We construe his pleadings as a request to change the child's name under Section 160.636(e). We agree with the Dallas and Fort Worth courts that a party making a name change request under Section 160.636(e) must establish both "best interest" and "good cause." We will examine the "best interest" issue first.

The burden was on Castelo to establish that changing C.M.V.'s surname is in the child's best interest. *See In re H.S.B.*, 401 S.W.3d at 83-84. The Fourteenth Court of Appeals in *H.S.B.* set forth six non-exclusive factors which it viewed as relevant in the majority of cases:

(1) the name that would best avoid anxiety, embarrassment, inconvenience, confusion, or disruption for the child, which may include consideration of parental misconduct and the degree of community respect (or disrespect) associated with the name;

(2) the name that would best help the child's associational identity within a family unit, which may include whether a change in name would positively or negatively affect the bond between the child and either parent or the parents' families;

(3) assurances by the parent whose surname the child will bear that the parent will not change his or her surname at a later time;

(4) the length of time the child has used one surname and the level of identity the child has with the surname;

(5) the child's preference, along with the age and maturity of the child; and

(6) whether either parent is motivated by concerns other than the child's best interest--for example, an attempt to alienate the child from the other parent.

*In re H.S.B.*, 401 S.W.3d at 84.

The child's name was changed to C.M.V. when he was four years of age and the trial court ordered his name changed to C.M.C. a few weeks before the boy's sixteenth birthday. Castelo had no contact with C.M.V. at the time of the name change in 2001 or for the next ten years. Castelo did not present any evidence that his surname would best help C.M.V.'s associational identity with the Castelo family unit or the level of identity C.M.V. has with the Castelo surname. Further, he did not present any evidence regarding C.M.V.'s preference even though C.M.V. was almost sixteen years of age. The record does not contain any evidence from which it could be inferred that changing C.M.V.'s surname to Castelo was actually in the child's best interest. While Castelo testified that he wanted his son's name changed back to "Castelo," we must keep in mind that what Castelo wants for his son is secondary to what is in his son's best interest. *See In re H.S.B.*, 401 S.W.3d at 83; *In re S.M.V.*, 287 S.W.3d at 449. We conclude that the evidence is legally insufficient to show that the name change is in C.M.V.'s best interest. It is therefore unnecessary to address whether the evidence is legally sufficient to show that good cause existed to support the name change. Likewise, we need not address the factual sufficiency arguments raised by Yepez. Because the trial court did not have legally sufficient evidence of best interest, we conclude it abused its discretion by changing C.M.V.'s surname. We sustain Issue Three.

## COMMON LAW MARRIAGE

Issues Four and Five pertain to the portion of the judgment which purports to declare that a common law marriage existed between the couple. In Issue Four, Yepez argues that the declaratory judgment is erroneous because it does not conform to the pleadings. She further contends that the judgment renders an impermissible advisory opinion because it does not address all of the elements of a common law marriage and does not actually declare whether a

common law marriage exists. In Issue Five, Yepez challenges the legal and factual sufficiency of the evidence supporting the implied declaration that a common law marriage exists. We will address the legal sufficiency of the evidence first.

An informal or common-law marriage exists in Texas if the parties (1) agree to be married, (2) live together in Texas as husband and wife after the agreement, and (3) represent to others that they are married. *See* TEX.FAM.CODE ANN. § 2.401(a)(West 2006); *Russell v. Russell*, 865 S.W.2d 929, 932 (Tex. 1993); *Burden v. Burden*, 420 S.W.3d 305, 308 (Tex.App.--Texarkana 2013, no pet.). An informal marriage does not exist until the concurrence of all three elements. *Burden*, 420 S.W.3d at 308; *Eris v. Phares*, 39 S.W.3d 708, 714 (Tex.App.--Houston [1st Dist.] 2001, pet. denied).

The trial court found that: (1) the parties "have at times admitted and contended that they were parties to a common law marriage alleged to have begun as early as 1996 with the parties continuing to reside together as late as 2000;" (2) Yepez filed a petition for divorce on July 5, 2000 in which she alleged the existence of a common law marriage; (3) Yepez filed a sworn petition to change C.M.V.'s name but did not serve Castelo; (4) Yepez filed a motion to dismiss the divorce action and included a self-serving statement that she believed Castelo was still married; and (5) Castelo's marriage to his former wife was dissolved in 1993. These findings are pertinent to the second and third elements, but the court did not find that the parties agreed to be married or that all three elements existed at the same time.

To establish that the parties agreed to be husband and wife, it must be shown that they intended to create an immediate and permanent marriage relationship, not merely a temporary cohabitation that may be ended by either party. *Burden*, 420 S.W.3d at 308; *Eris*, 39 S.W.3d at 714. An agreement to be married cannot be inferred from the mere evidence of cohabitation and

representations of marriage to others, but such evidence may be circumstantial evidence of an agreement to be married. *Russell*, 865 S.W.2d at 933. The circumstances of each case must be determined from the facts of that case. *Id.* Yepez testified that she believed she could not be married to Castelo because she understood that he was still married to another woman. While Castelo introduced evidence at trial showing his prior marriage had been dissolved in 1993, Yepez was unaware of that fact at the time of their cohabitation. When asked whether he told Yepez that he was divorced, Castelo testified, "I believe I did, yes." On cross-examination, he admitted he did not remember what he had told Yepez. Castelo testified that they lived together from 1996 to 1998 and they agreed to be married. When asked on cross-examination to explain why he had indicated on his tax returns that he was single, Castelo engaged in the following exchange with Yepez's counsel:

[Counsel]: Mr. Castelo, have you been filing as a single person your tax returns for the last three years that you just tendered to the Court?

[Castelo]: I believe so, yes.

[Counsel]: Why are you filing single if you're married?

[Castelo]: Because I'm not with Ms. Yepez and I'm by myself right now. That's the reason.

[Counsel]: Okay. That's not asking whether or not you live in your own house, right? The IRS is asking for your marital status, correct?

[Castelo]: On the form it states that, yes.

[Counsel]: And you've indicated that your marital status is single, right?

[Castelo]: Right now I'm by myself, yes.

[Counsel]: So how can you come to this Court and contend that you're engaged in a common law marriage to my client and still file single with the IRS?

[Castelo]: It was in regards to the issue with [C.M.V.] and the time period together.

> [Counsel]: Okay. So you're only married as it pertains to [C.M.V.], but you're not married as it pertains to tax filings, right?
>
> [Castelo]: No, what I'm saying is that when we were together, I looked at us as a family unit and we were both a mother and father to [C.M.V.] at that time.

This testimony demonstrates that Castelo believed a common law marriage revolved solely around cohabitation. He also apparently thought that since they were no longer living together, he was, once again, "single." To establish that the parties agreed to be husband and wife, Castelo was required to show that they intended to create an immediate and permanent marital relationship, not merely a temporary cohabitation that may be ended by either party. *Burden*, 420 S.W.3d at 308; *Eris*, 39 S.W.3d at 714. There is no evidence from which it can be inferred that both Yepez and Castelo agreed to be married as opposed to a temporary cohabitation. Further, there is no evidence that they lived together *after* they agreed to be married. We also emphasize that if a proceeding in which a common law marriage is to be proved is not commenced before the second anniversary of the date on which the parties separated and ceased living together, it is rebuttably presumed that the parties did not enter into an agreement to be married. The parties separated in April 1998. Yepez filed for divorce in July 2000. While she alleged a common law marriage, the two-year window had already closed. She dismissed the lawsuit and Castelo sought no affirmative relief. Ten years later, he faced the same burden of rebutting the presumption that there was no agreement to be married. Having found the evidence legally insufficient to establish the existence of a common law marriage, we need not address the factual sufficiency of the evidence or Issue Four. Issue Five is sustained.

## FRAUD

Issues Six and Seven pertain to the portion of the judgment awarding damages to Castelo on his fraud claim. In Issue Six, Yepez asserts that the judgment on the tort claims should be

vacated because Castelo lacks standing to pursue those claims because he failed to disclose the claims on his bankruptcy schedules. In Issue Seven, Yepez challenges the legal and factual sufficiency of the evidence supporting the portion of the judgment finding that she committed fraud. We begin by addressing Issue Seven.

The elements of fraud are: (1) a material misrepresentation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made the statement recklessly without any knowledge of the truth; (4) the speaker made the representation with the intent that the other party should act on it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. *In re FirstMerit Bank*, 52 S.W.3d 749, 758 (Tex. 2001); *Formosa Plastics Corporation USA v. Presidio Engineers & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998). Fraud by nondisclosure is a subcategory of fraud because, where a party has a duty to disclose, the non-disclosure may be as misleading as a positive misrepresentation of facts. *Schlumberger Technology Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997). The elements of fraud by nondisclosure are (1) the defendant failed to disclose facts to the plaintiff, (2) the defendant had a duty to disclose those facts, (3) the facts were material, (4) the defendant knew the plaintiff was ignorant of the facts and the plaintiff did not have an equal opportunity to discover the facts, (5) the defendant was deliberately silent when it had a duty to speak, (6) by failing to disclose the facts, the defendant intended to induce the plaintiff to take some action or refrain from acting, (7) the plaintiff relied on the defendant's nondisclosure, and (8) the plaintiff was injured as a result of acting without that knowledge. *Horizon Shipbuilding, Inc. v. BLyn II Holding, LLC*, 324 S.W.3d 840, 850 (Tex.App.--Houston [14th Dist.] 2010, no pet.).

Castelo's counter-petition included multiple theories of fraud. The trial court's judgment included findings indicating the court addressed only the fourth theory, but it did not make written findings of fact and conclusions of law. Consequently, we must address any theories which might support the judgment.

First, Castelo alleged that Yepez committed fraud by disappearing with C.M.V., but there is no evidence that Yepez made a material misrepresentation which Yepez knew was false, that Yepez intended Castelo to act on the misrepresentation, that Castelo in fact acted in reliance on the misrepresentation, or that he was injured as a result. Consequently, the evidence is legally insufficient to support a finding of fraud under the first theory.

Each of Castelo's remaining three theories pertains to Yepez's alleged failure to provide him with information. Silence can amount to false representation when an actor has a duty to speak and yet remains silent. *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001). In his second theory, Castelo asserted that Yepez failed to notify him of C.M.V.'s location and legal status and interfered with his right to communicate with his child by hiding C.M.V. from him. His petition cited Sections 2.501,[6] 105.006, 105.007,[7] 151.001,[8] and 153.076[9] of the Texas Family Code in support of his assertion that Yepez had a duty to provide him with information about his son,

---

[6] TEX.FAM.CODE ANN. § 2.501 (West 2006)(providing that each spouse has the duty to support the other spouse).

[7] Section 105.006 specifies the contents of a final order and requires a final order to contain each party's current residence, among other things, and requires the court to order each party to inform each other party, the court, and the state case registry of an intended change of the information required by this section. *See* TEX.FAM.CODE ANN. § 105.006 (West 2014). Under Section 105.007, a party must comply with an order requiring notice of change of information by giving written notice to each other party of an intended change in the party's current residence address. *See* TEX.FAM.CODE ANN. § 105.007 (West 2014).

[8] Section 151.001 of the Family Code sets forth the rights and duties of a parent of a child. *See* TEX.FAM.CODE ANN. § 151.001 (West 2014). Subsection (a) provides that a parent has the right to have physical possession, to direct the moral and religious training, and to designate the residence of the child. *Id.*

[9] TEX.FAM.CODE ANN. § 153.076 (West 2014)(requiring a court to order that each conservator of a child has a duty to inform the other conservator of the child in a timely manner of significant information concerning the health, education, and welfare of the child).

including the child's location. At the time these events occurred, Castelo had not admitted paternity and paternity had not been adjudicated. No court had entered any orders related to conservatorship of C.M.V. Consequently, Castelo did not have a right to information about C.M.V. and these statutes did not impose a duty on Yepez to inform him of her residence.

In his third theory, Castelo alleged that Yepez failed to inform him of "the probability of his paternity . . . ." He relies on the same statutes mentioned in the discussion of his second theory. None of these statutes imposed a duty on Yepez to inform Castelo that he was likely the father of C.M.V.

In his fourth and final theory of fraud by nondisclosure which was raised during the hearing, Castelo alleged that Yepez did not notify him that she had filed a petition seeking to change C.M.V.'s name or that the court had entered a judgment changing the name. Yepez conceded that she did not notify Castelo of her petition to change their child's surname or of the judgment changing his surname, but there is no evidence that Castelo relied on her nondisclosure or that he was injured as a result of acting without that knowledge. Castelo testified that being without his son negatively affected him, but this injury is completely unrelated to Yepez's failure to serve him with the petition to change C.M.V.'s surname. Indeed there is no evidence that Castelo even knew of the name change until the Attorney General launched this litigation.

For all of these reasons, we conclude that the evidence is legally insufficient to prove that Yepez committed fraud or fraud by nondisclosure. It is unnecessary to address the factual sufficiency of the evidence. Further, we need not address Yepez's argument raised in Issue Six that Castelo lacked standing to pursue his tort claims because he did not disclose the claims on his bankruptcy schedules. Issue Seven is sustained.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

In Issue Eight, Yepez argues that the evidence is legally and factually insufficient to support a finding in favor of Castelo on his intentional infliction of emotional distress claim. The heading for the section of the judgment addressing Castelo's tort claims lists both fraud and intentional infliction of emotional distress, but the text of the judgment refers only to the fraud claim. The judgment also includes a clause denying all relief not expressly granted. We conclude that the judgment denied relief on Castelo's intentional infliction of emotional distress claim. Consequently, it is not necessary to address Issue Eight.

## CONCLUSION

We pause here to address the concerns expressed by Castelo's counsel during oral argument. He emphasized the plight of a man who is not a parent, an adjudicated father, or a presumed father. The Family Code defines parenthood thusly:

> 'Parent' means the mother, a man presumed to be the father, a man legally determined to be the father, a man who has been adjudicated to be the father by a court of competent jurisdiction, a man who has acknowledged his paternity under applicable law, or an adoptive mother or father.

TEX.FAM.CODE ANN. § 101.024(a). A "presumed father" is a man who, by operation of law under Section 160.204, is recognized as the father of the child until that status is rebutted or confirmed in a judicial proceeding. TEX.FAM.CODE ANN. § 160.102(13). An "acknowledged father" is a man who has established a father-child relationship under Chapter 160. TEX.FAM.CODE ANN. § 101.0010. An "adjudicated father" is a man who has been adjudicated by a court to be the father of a child. TEX.FAM.CODE ANN. § 160.102(1). Castelo was none of the above. Legally speaking, he was a bystander.

It is certainly true that absent legal intervention, a man in Castelo's position has no parental rights. The mother has no obligation to inform him of her whereabouts or the whereabouts of his child. But that does not mean Castelo lacked remedies. When the divorce

suit was pending, Yepez alleged that Castelo was the father of the child.[10] Castelo denied it when he could have taken the opportunity at that very point to establish his paternity and gain rights of conservatorship. Despite having counsel to advise him, Castelo skipped his chance. He continued to deny his paternity until DNA testing confirmed it in the present litigation. His "judicial spotlight" claims of tortious conduct by Yepez were brought as an affirmative defense to retroactive child support. While retroactive support was ordered, Castelo's finger-pointing toward a woman who owed him no obligation of disclosure allowed him to recover more in monetary damages than the child support he was ordered to pay.

Having sustained Issue One, we reverse that portion of the trial court's judgment setting aside the name-change judgment entered in Cause Number 2001CM6129 and render judgment denying Castelo's motion to confirm or change the child's surname. Having sustained Issue Three, we reverse that portion of the judgment ordering C.M.V.'s surname changed to Castelo and we render judgment confirming that his surname is "V." Having sustained Issue Five, we reverse the declaratory judgment and render judgment that a common law marriage does not exist between Yepez and Castelo. Having sustained Issue Seven, we reverse the portion of the judgment finding in favor of Castelo on his fraud claim and awarding him damages in the amount of $50,000, and we render judgment that he take-nothing on the fraud claim. The judgment of the trial court is otherwise affirmed.


May 13, 2015
                                    ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, J., and Barajas, C.J. (Senior Judge)
Barajas, C.J. (Senior Judge)(Sitting by Assignment)

---

[10] An "Alleged father" means a man who alleges himself to be, or is alleged to be, the genetic father or a possible genetic father of a child, but whose paternity has not been determined. TEX.FAM.CODE ANN. § 101.0015.