# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-23-00498-CV

---

**Justin M. Thomas, Independent Executor of the Estate of James Henry Thomas, Appellant**

**v.**

**Lois Doolittle, Appellee**

---

### FROM THE COUNTY COURT AT LAW NO. 2 OF HAYS COUNTY
### NO. 22-0099-P, THE HONORABLE CHRISTOPHER P. JOHNSON, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellant Justin M. Thomas (Justin), independent executor of the estate of Dr. James Henry Thomas (Thomas), challenges the legal and factual sufficiency of the evidence in support of the trial court's order granting appellee Lois Doolittle's petition for declaratory judgment, in which the court ordered that Thomas and Doolittle were to be considered informally married. We affirm the trial court's order.

## BACKGROUND

Thomas died in March 2021. In July 2022, the trial court admitted to probate Thomas's 2015 will, in which he had attested, "At the time of the execution of this Will, I am not married." The will bequeathed his personal property to his two children, Justin and Stephanie Thomas (Stephanie); bequeathed the remainder of his estate to the James Henry Thomas Living Trust; and appointed Justin as independent executor of Thomas's estate. The

trust agreement, which was executed on the same day as the will, named Justin and Stephanie as Thomas's beneficiaries; awarded each child half of the trust amount and provided each with a monthly allotment of $5,000; appointed Justin as successor trustee on Thomas's death; scheduled a $2,500 monthly allotment to Doolittle until her death; and entitled her, if she survived Thomas, to reside for the rest of her life in the home that the two had purchased in San Antonio in 2012 but had sold in 2019. The trust agreement did not address Thomas's interest in the home that he and Doolittle had purchased in San Marcos, Texas, in 2019, and in which they had resided until his death.[1]

In November 2022, Doolittle filed a petition for declaratory judgment asking that the trial court find that she and Thomas had been informally married from July 5, 2012, until his death. The court held a hearing on the petition, at which Doolittle; her brother; members of Thomas's family; Justin's friend; and Thomas's ex-wife, Carolyn Thomas (Carolyn), testified. A video deposition of Dr. Murray Holcomb, a friend and former student of Thomas's, was admitted at the hearing. The trial court also admitted deeds to the two homes purchased by Doolittle and Thomas, marital status affidavits executed by the couple in 2019, the trust agreement, Thomas's death certificate, and a reporter's record from the July 2022 probate hearing on Thomas's will.

Doolittle testified about the nature of her and Thomas's relationship. The two met at work in 1983 and began dating in 1987 when Thomas, who was "estranged" from Carolyn at the time, "left his wife and got his own home for a period of time." Doolittle and Thomas were "attached at the hip"; they worked together, spent their evenings and weekends together, and

[1] Doolittle testified at the petition hearing that "with Covid and [Thomas's] illness and everything else, we didn't even realize that it didn't state our current residence in his trust after we moved."

2

"[t]raveled the wor[l]d." Thomas and Carolyn divorced in January 2011, and Doolittle and Thomas agreed to marry around July 2012, shortly before moving to Texas and jointly purchasing a home in San Antonio. Doolittle testified that she and Thomas "felt that way for a very, very long time" but in 2012 had "said we are husband and wife. We've basically been acting as husband and wife for a long, long time." Thomas bought her a wedding ring, which she showed the trial court during the hearing.[2]

After purchasing their home in San Antonio, Doolittle and Thomas lived together and "presented [them]selves as [married] to everyone in town." Asked why he had not referred to her as his wife in his 2015 will, she testified that they had both been "very ignorant of the law in Texas" and that although they had known "there was such a thing as common law," Thomas might have said that he was single to indicate that they had not been formally married.

In 2019, after Thomas was diagnosed with prostate cancer, he and Doolittle sold their San Antonio home and purchased one in San Marcos. The general warranty deed conveying the San Antonio property referred to the grantors as "JAMES HENRY THOMAS and LOIS KAY DOOLITTLE, husband and wife."[3] As part of the purchasing process for their new home, Doolittle and Thomas executed marital status affidavits, in which they swore under oath they had been "continuously married" to each other since 2001. Doolittle testified that she had been present when Thomas signed his affidavit, that they had not been confused about the affidavits' meaning, that he had been "bad about dates," and that he might have "mixed up 2001 and 2011."

---

[2] The trial court excluded a purported receipt for the ring on hearsay grounds.

[3] The 2012 warranty deed for the San Antonio property, which named the grantors as "Daniel D. Smith and wife, Kristen I. Smith," referred to the grantees only as "James Henry Thomas and Lois Kay Doolittle."

3

Doolittle and Thomas continued to live together until his death in March 2021. They paid their bills together, shared a strongbox and joint checking and savings accounts, took many photographs together, and listed both their names on their checks. She was good friends with his immediate relatives, attended two of his family reunions and a "Vietnam reunion" with his friends, was his medical power of attorney, and considered his grandson to be hers. She referred to Thomas as her husband or spouse, and he referred to her as his wife or spouse. However, Justin and Stephanie referred to her as "Ms. Doolittle" and "Lois," respectively.

Near the end of his life, Thomas asked Doolittle to read his will aloud in Justin's presence. Doolittle testified that Thomas's cancer had metastasized to his brain, that "his moods were going in and out," that he had been taking a "variety of medications," and that "he was getting demented." When she noticed that Justin had stated that Thomas was unmarried on his death certificate, she called the funeral home to have it changed but was told that only Justin could do so. At Thomas's funeral in April 2021, she represented herself as his wife, thanked attendees, and told them "how much Jim loved them."

Asked on cross-examination about a May 2, 2022 letter from her attorney, in which the attorney referred to Doolittle and Thomas's co-ownership of the San Marcos property but did not assert a marital relationship, Doolittle testified that "[a]t the time, . . . this . . . wasn't about establishing a marriage" and that she had been "trying to help pay for some of the taxes and things that [she felt] . . . the trust should be paying for." Similarly, she testified that she had not asserted a marital relationship to Thomas during the probate hearing because she had not had an attorney present, had not anticipated addressing the trial court, and "didn't figure th[at] was the place [or] time." At the probate hearing, Doolittle—who was sitting in the gallery—denied having an interest in Thomas's estate other than the San Marcos residence. She agreed that her

4

informal marriage to Thomas had first been raised in a letter written by her attorney to Justin's attorney on September 1, 2022.

Thomas's sister, Hermoine Saunders (Hermoine), and her husband, Charles Saunders (Charles), testified about their understanding of Doolittle and Thomas's relationship. Hermoine had known Doolittle since Doolittle was hired as Thomas's secretary. Four or five years later, Hermoine learned that Thomas and Doolittle were in a relationship. Although Thomas did not introduce Doolittle to Hermoine as his wife, he and Doolittle "held themselves out as a married couple . . . after a[ ]while." By the end of Thomas's life, Hermoine believed that he and Doolittle were informally married and had been for at least a few years. When questioned as to how the relationship differed from "an intimate" one or a "partnership," Hermoine testified that the couple had traveled together and that Thomas had bought Doolittle "things that a husband would gift a wife."

Asked if Doolittle and Thomas's relationship had continued after Thomas's 2011 divorce, Charles testified that "it was always with [Doolittle]," that Thomas and Doolittle's relationship "was like husband and wife," that they lived together as a married couple, and that Thomas "was always talking about retiring. He was going to go to Texas and retire with Lois." Charles also testified that Thomas and Doolittle's relationship had differed from "an intimate relationship" because "they always presented themselves as husband and wife and buying a house and doing husband-and-wife stuff." While Charles had not seen Thomas since 2013, he had maintained regular phone contact with him and Doolittle.

Thomas's cousin, Laura Mimms, and her sister, Dr. Brenda Matthews, also testified regarding their impressions of Doolittle and Thomas's relationship. Mimms had known Doolittle for over 20 years and used to speak with her and Thomas by phone "[a]ll the time."

5

Doolittle showed Mimms an engagement ring given to her by Thomas and stated that "they were getting married." In a phone conversation approximately two or three weeks before he died, Thomas asked Mimms to "always be there for Lois, because he knew she would be a widow, and [Mimms] was a widow." Thomas "always alluded to Lois as being his wife" and, when he and Doolittle purchased their San Marcos home in 2019, told Mimms that he "wanted his wife to be situated and in a home that she would love." Mimms testified that it "never really came across [her] mind that [Doolittle] was not his wife." Asked to "explain what made their relationship a marriage relationship instead of just an intimate relationship," Mimms referred to the commingling of Thomas and Doolittle's finances, their traveling together, Doolittle's willingness to relocate for him, Thomas's desire to provide her with a home, and their being "a loving couple."

Matthews testified that she and Thomas had been like brother and sister and had spoken by phone "[a]ll the time." She visited Thomas and Doolittle at their home and thought that they were married. Thomas referred to Doolittle as his wife and told Matthews, "Lois and I are together. We are married." Shortly before his death, Matthews asked him if she should visit "to come be with Lois, your wife," and he replied, "No, I don't want you to see me like this."

Doolittle's brother, John Richard Graham, testified that he had been good friends with Thomas and had known him for around 30 years. Graham considered Thomas to be a family member, and on one occasion prior to 2011, Thomas referred to Graham as his brother-in-law. Graham testified that he had considered Thomas and Doolittle to be married; that she had always held herself out as married to Thomas; and that although she may not have always said that they were married, Graham did not "always say [he was] married to [his] wife either." Graham also testified that while he did not remember specific instances after 2011 when

6

Thomas had referred to Doolittle as his wife or spouse, "[t]he relationship is what it is, whether – I don't know between intimate and married. To me, it's hard to differentiate that."

Thomas's second cousin, Earl Nix, testified that he was the family historian for "the Lawrence side of the family – that's where Justin's mother come in at." Thomas met Nix at a family reunion but did not represent that he was married. They instead discussed Justin's mother, Carolyn. After the reunion, Nix and Thomas spoke a couple of times about family history, but Nix did not recall Thomas stating that he was married to Doolittle. Nix first learned of Doolittle when she asked to attend a 2022 family reunion that Nix had planned. She came to the reunion and tried "to get [Nix] to accept her into the family." Nix "never thought she was [Thomas's] wife" but considered her to be "just a friend."

Brett Hinson, Justin's friend, testified that he had met Thomas and had known his family since Hinson and Justin attended high school together in 1995. Thomas never represented to Hinson that he was married. Hinson learned about Doolittle "recently" but had been aware that Thomas "was down in Texas with her."

Carolyn testified about her marriage to Thomas and her knowledge of his relationship with Doolittle. Carolyn was married to Thomas for nearly 44 years, and they divorced on August 11, 2011. She had "sporadic" contact with him after the divorce, but he never represented to her that he was married to Doolittle. To the contrary, he told Carolyn "on more than one occasion he was not married." When they danced at their daughter's birthday party in 2018, he kissed Carolyn "[o]n the side of the mouth," which was not "unusual behavior" or "an unusual display of affection" from him. Although they did not discuss his life in Texas, Carolyn testified that he would have told her if he had remarried. She did not know that he had lived with Doolittle since 2012 but when she heard a woman's voice in the background of a call

7

with him a few years after their divorce, she suspected that it was Doolittle because "[her] husband was not a womanizer, and the only person [she] could think of would have been [Doolittle]."

In his video deposition, Dr. Murray Holcomb, who was Thomas's student in medical school and later his friend for 30 years, testified about his observations regarding Doolittle and Thomas's relationship. Holcomb testified that he met Thomas around 1985, that Thomas divorced Carolyn in approximately the late 1980's or early 1990's, and that it became known after 1991 that Thomas and Doolittle were a couple. After Thomas retired, he and Holcomb spoke "not infrequently" about family. Thomas was "a little more guarded" than others when discussing family; he did not often refer to his children but would sometimes talk about his parents, his sister, or Doolittle. He never mentioned marrying Doolittle, and they did not refer to each other as "husband" or "wife." However, they used "collective terms" when speaking about their lives.

Holcomb testified that he did not know what it meant to "live together as husband and wife." Asked whether Thomas and Doolittle held themselves out to the public as married, he testified, "I would think that if you saw them, you would maybe make that assumption, even though they didn't verbally say that." Doolittle and Thomas were "always together," and Holcomb could not think of "a time in the last ten years when [he] saw Dr. Thomas when [he] didn't see Lois." Doolittle cared "almost constantly" for Thomas after he entered hospice, and he "relied on her completely and constantly and . . . always wanted her there, wanted to talk to her, needed her there, and she was an integral part of his life and decision-making and what he – who he wanted around him and to help take care of him."

8

Justin testified on his own behalf and contradicted much of Doolittle's and other witnesses' testimony. According to Justin, Thomas and Doolittle's relationship began in approximately 2012. Before Thomas moved to Texas that year, he and Justin had a conversation about marriage in which Thomas stated that he did not plan on remarrying. Thomas described Doolittle as "simply just a good friend." Justin testified that he did not believe that Thomas's signature on his 2019 marriage status affidavit was in Thomas's handwriting.

Justin agreed that Thomas had been on strong medications near the end of his life but testified that he had eventually come off of the medications and had been "very equipped to have . . . a coherent conversation." Thomas's caregiver had not been Doolittle but rather "Jude" and another person whose name Justin could not remember. During Justin's last visit, he and Thomas discussed Thomas's will on multiple occasions. Shortly before his death, Thomas made Doolittle read the will aloud to Justin. When she began coughing, Justin had offered to read the will instead, but Thomas had told Justin to stop and stated, "No, give it back to her." Afterward, Thomas and Justin spoke privately and Thomas—referring to the will—stated, "I want to make sure that nothing had changed in these documents."

Justin testified that Doolittle had not claimed to be Thomas's wife until after he had died. She drafted a version of Thomas's obituary asserting that they were married, and Justin told her, "My dad was not married to you. I know this for a fact, and he has passed, and I consider it to be extremely disrespectful." Nevertheless, he invited her to speak at Thomas's funeral, but she refused. She only claimed to be Thomas's spouse after Justin refused to have the trust "pay for half of the expenses of the house."

Following the hearing, the trial court granted Doolittle's petition without making findings of fact or conclusions of law. The court further ordered that Thomas and Doolittle "are

9

to be considered married under Texas Family Code Section 2.401," that Doolittle is Thomas's surviving spouse, and that Doolittle possesses a life estate in the San Marcos property. *See* Tex. Fam. Code § 2.401 (governing proof of informal marriage). This appeal followed.

## DISCUSSION

We construe Justin's brief to raise a single issue challenging the legal and factual sufficiency of the evidence supporting the existence of an informal marriage between Thomas and Doolittle.[4]

### I. Standard of Review

A trial court's determination regarding the existence of an informal marriage is subject to review for legal and factual sufficiency. *Russell v. Russell*, 865 S.W.2d 929, 933 (Tex. 1993). The existence of an informal marriage is a fact question, and the party seeking to establish the existence of the marriage at trial bears the burden of proving it by a preponderance of the evidence. *Burden v. Burden*, 420 S.W.3d 305, 308 (Tex. App.—Texarkana 2013, no pet.).

A party who challenges the legal sufficiency of an adverse finding on which it did not bear the burden of proof at trial must demonstrate on appeal that no evidence supports the adverse finding. *Graham Cent. Station, Inc. v. Pena*, 442 S.W.3d 261, 263 (Tex. 2014) (per curiam). In reviewing for legal sufficiency, "we view the evidence in the light most favorable to the . . . finding, crediting favorable evidence if a reasonable fact-finder could, and disregarding contrary evidence unless a reasonable fact-finder could not." *Gonzales v. Maggio*, 500 S.W.3d 656,

---

[4] Justin, in two issues, asks that we "reverse the Trial Court's declaration of a common-law marriage and render judgment because the evidence is legally insufficient" or, alternatively, "reverse the Trial Court's declaration of a common-law marriage and remand because the evidence is factually insufficient."

662 (Tex. App.—Austin 2016, no pet.) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005)). We indulge every reasonable inference that would support the challenged finding. *Abila v. Miller*, 683 S.W.3d 842, 846 (Tex. App.—Austin 2023, no pet.) (citing *City of Keller*, 168 S.W.3d at 822). We will sustain a no-evidence challenge only if (1) evidence of a vital fact is absent, (2) rules of law or evidence bar us from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *Pike v. Texas EMC Mgmt., LLC*, 610 S.W.3d 763, 783 (Tex. 2020). More than a scintilla of evidence exists to support a finding when the evidence enables reasonable and fair-minded people to differ in their conclusions. *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 347 (Tex. 2015).

When a party challenges the factual sufficiency of an adverse finding on an issue on which he did not have the burden of proof, he must demonstrate that the finding is "so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust." *Wichita County v. Environmental Eng'g & Geotechnics, Inc.*, 576 S.W.3d 851, 862 (Tex. App.—Austin 2019, no pet.) (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986)). In reviewing for factual sufficiency, "we examine the entire record, considering the evidence in favor of and contrary to the challenged finding." *Id.*

Under either standard, the trier of fact "is the sole judge of the credibility of witnesses and the weight to be given their testimony." *Altice v. Hernandez*, 668 S.W.3d 399, 410 (Tex. App.—Houston [1st Dist.] 2022, no pet.) (citing *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003)). When faced with conflicting evidence, the trier of fact "may choose which witnesses to believe and may resolve inconsistencies in any witness'[s] testimony." *Burden*, 420 S.W.3d at 308 (citing *McGalliard v. Kuhlmann*,

11

722 S.W.2d 694, 697 (Tex. 1986)). Where, as here, the trial court did not make findings of fact and need not have done so, we imply all findings that are necessary to support its ruling and are supported by the evidence. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). Because this appellate record includes the reporter's and clerk's records, the trial court's implied findings are not conclusive and may be challenged for legal and factual sufficiency. *See id.*

## II. Existence of an Informal Marriage

"An informal or common-law marriage exists in Texas if the parties (1) agree to be married, (2) live together in Texas as husband and wife after the agreement, and (3) represent to others that they are married." *In re C.M.V.*, 479 S.W.3d 352, 360 (Tex. App.—El Paso 2015, no pet.) (citing Tex. Fam. Code § 2.401(a); *Russell*, 865 S.W.2d at 932; *Burden*, 420 S.W.3d at 308); *see Ex parte Threet*, 333 S.W.2d 361, 364 (Tex. 1960) (orig. proceeding) (characterizing third element as "holding out to the public that the couple are husband and wife"). All three elements must be satisfied concurrently for an informal marriage to exist. *In re C.M.V.*, 479 S.W.3d at 360 (citing *Burden*, 420 S.W.3d at 308; *Eris v. Phares*, 39 S.W.3d 708, 714 (Tex. App.—Houston [1st Dist.] 2001, pet. denied)). The circumstances of each case must be determined from the facts of that case. *Id.* (citing *Russell*, 865 S.W.2d at 933).

### A. Agreement

"To establish that the parties agreed to be husband and wife, it must be shown that they intended to create an immediate and permanent marriage relationship, not merely a temporary cohabitation that may be ended by either party." *Burden*, 420 S.W.3d at 308. Proof of an agreement to be married may be made by circumstantial evidence or conduct of the parties.

12

*In re O.R.M.*, 559 S.W.3d 738, 744 (Tex. App.—El Paso 2018, no pet.). "The testimony of one of the parties to the marriage constitutes some direct evidence that the parties agreed to be married." *Small v. McMaster*, 352 S.W.3d 280, 283 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (citing *Eris*, 39 S.W.3d at 714). Further, evidence of cohabitation and representations of marriage to others are circumstantial evidence of an agreement to be married. *In re C.M.V.*, 479 S.W.3d at 360 (citing *Russell*, 865 S.W.2d at 933).

Doolittle testified that she and Thomas agreed to be married in July 2012. Her testimony is more than a scintilla of direct evidence that the two agreed to be married, and we conclude that evidence of an agreement was therefore legally sufficient. *See Eris*, 39 S.W.3d at 714 (citing *Collora v. Navarro*, 574 S.W.2d 65, 70 (Tex. 1978); *In re Estate of Giessel*, 734 S.W.2d 27, 32 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.)).

Additional evidence of an agreement included Doolittle's testimony that Thomas bought her a wedding ring; the couple's approximately nine-year cohabitation and joint purchase of two homes; the 2019 warranty deed for the San Antonio property, which referred to Thomas and Doolittle as "husband and wife"; the 2019 marital status affidavits swearing that they had been married since 2001; the commingling of their finances; Thomas's providing for Doolittle in his trust; his giving her medical power of attorney and designating her as successor trustee and successor executor; her serving as his primary end-of-life caregiver; his referring to Graham as his brother-in-law; and testimony from Doolittle, Mimms, and Dr. Matthews that Thomas referred to Doolittle as his wife. Evidence contradicting an agreement included Thomas's 2015 will, which recited that he was not married; his asking Justin to read the will aloud to Doolittle in 2021; Doolittle's statement at the probate hearing that she had no interest in Thomas's estate

other than the San Marcos property[5]; and testimony from various witnesses at the petition hearing that Thomas did not refer to Doolittle as his wife or spouse, stated that he was unmarried, or did not affirmatively represent that he was married.

Although Justin argues that the 2019 marital status affidavits lack probative value because Thomas and Carolyn were still married in 2001—when the affidavits averred that the informal marriage began—the trial court could have found credible Doolittle's testimony that Thomas may have intended to write 2011, the year he and Carolyn divorced. *See Burden*, 420 S.W.3d at 308.

Moreover, even if the trial court believed that Thomas intended to attest that his marriage to Doolittle began in 2001, his affidavit would still constitute evidence of an agreement to be married. It is true that "[i]f an impediment to the creation of a lawful marriage between the parties exists, as when one is married to another, there can be no common law marriage, even if all three elements are proven." *Ballesteros v. Jones*, 985 S.W.2d 485, 490 (Tex. App.—San Antonio 1998, pet. denied); *see* Tex. Fam. Code § 6.202(a) ("A marriage is void if entered into when either party has an existing marriage to another person that has not been dissolved by legal action or terminated by the death of the other spouse."). However, when the evidence shows that the agreement continued beyond the removal of the impediment, the agreement becomes valid and effectual as of the time of the removal. *See* Tex. Fam. Code § 6.202(b) ("The later marriage that is void under this section becomes valid when the prior marriage is dissolved if, after the date of the dissolution, the parties have lived together as husband and wife and represented

---

[5] Justin's assertion that Doolittle "admitted" during the probate hearing that she was only in a "partnership relationship" with Thomas is incorrect. Rather, Justin's attorney represented to the probate court that Thomas and Doolittle "[w]ere not married but [were] in [a] partnership relationship."

themselves to others as being married."); *Ballesteros*, 985 S.W.2d at 490 (finding "some evidence of the required agreement" where "the parties lived together as husband and wife and represented themselves to others as being married after Manetou's wife died"); *Howard v. Howard*, 459 S.W.2d 901, 904–05 (Tex. App.—Houston [1st Dist.] 1970, no writ) (inferring agreement "to presently become husband and wife" where after man's divorce, he and his partner "continued to cohabit and to hold themselves out to the public as husband and wife"); *Consolidated Underwriters v. Kelly*, 15 S.W.2d 229, 230 (Tex. [Comm'n Op.] 1929, jdgmt adopted) (concluding that couple's "continued living together as husband and wife" after death of woman's legal husband "bespeaks a continued intention and agreement, day by day, to be husband and wife").

Because the affidavits were executed after Thomas's divorce, they constitute evidence of a valid agreement to be married following the removal of the legal impediment. The evidence also shows that after the 2011 divorce, Thomas and Doolittle continued to live together and represent themselves as married. From this record, we cannot say that the evidence of an agreement to be married was so weak that the trial court's finding was clearly wrong and manifestly unjust. *See Wichita County*, 576 S.W.3d at 862. To the extent that the silence of the trust agreement and San Marcos warranty deed as to Thomas's marital status is evidence of no agreement—as Justin asserted—our conclusion is unchanged.

**B.  Cohabitation**

The second element of an informal marriage is that the parties live together in Texas as husband and wife after the agreement. *See Russell*, 865 S.W.2d at 932; *In re C.M.V.*,

15

479 S.W.3d at 360; *Burden*, 420 S.W.3d at 308. "Cohabitation need not be continuous for a couple to enter into a common-law marriage." *Small*, 352 S.W.3d at 284.

Justin argues that because "there is no evidence that [Thomas] agreed to be married to [Doolittle], they could not have lived together as husband and wife." Having concluded above that there was sufficient evidence of an agreement to be married as early as 2011, however, we conclude that the uncontradicted evidence of their subsequent cohabitation until Thomas's death was legally and factually sufficient to support the trial court's finding that the second element of informal marriage was satisfied. Insomuch as Justin contends that Thomas and Doolittle did not live together *as husband and wife* because they did not present themselves as such, his contention is addressed below.

## C.    Representation/Holding Out

To satisfy this element of informal marriage, "parties must, in Texas, have represented to others that they were married." *Eris*, 39 S.W.3d at 714 (citing Tex. Fam. Code § 2.401(a)(2)). The statutory requirement of "represented to others" in subsection 2.401(a)(2) is synonymous with "holding out to the public." *Id.* at 714–15 (citing *Winfield v. Renfro*, 821 S.W.2d 640, 648 (Tex. App.—Houston [1st Dist.] 1991, writ denied); *Giessel*, 734 S.W.2d at 30). "Whether the evidence is sufficient to establish that a couple held themselves out as husband and wife turns on whether the couple had a reputation in the community for being married." *Small*, 352 S.W.3d at 285. Proving such a reputation "requires evidence that the couple 'consistently conducted themselves as husband and wife in the public eye or that the community viewed them as married.'" *Id.* (quoting *Danna v. Danna*, No. 05-05-00472-CV, 2006 WL 785621, at *2 (Tex. App.—Dallas Mar. 29, 2006, no pet.) (mem. op.)).

The element of holding out requires more than occasional references to each other as "wife" and "husband." *Smith v. Deneve*, 285 S.W.3d 904, 910 (Tex. App.—Dallas 2009, no pet.). However, representation may be proven "by conduct and actions of the parties. Spoken words are not necessary to establish representation as husband and wife." *Eris*, 39 S.W.3d at 715 (internal citations omitted). An informal marriage can be "secret from some persons," *Winfield*, 821 S.W.2d at 651, but both parties must represent themselves as married, *Small*, 352 S.W.3d at 285.

Viewed in the light most favorable to the trial court's ruling, the record contains ample evidence that the parties represented themselves as married. As noted above, Thomas purchased for Doolittle a wedding ring, which Mimms—although she remembered it to be an engagement ring—recalled seeing. Thomas and Doolittle lived together for over nine years in two homes that they jointly purchased. *Cf. Ex parte Threet*, 333 S.W.2d at 364 (identifying publicly sharing common residence as proof of holding out). The couple referred to themselves as married in both their 2019 affidavits and the 2019 warranty deed, which was publicly filed. *Cf. Small*, 352 S.W.3d at 286 ("Murriah admitted that she has no documents in which she referred to Jack as her husband."). Mimms testified that Thomas and Doolittle "had their finances together," and Doolittle testified that she and Thomas shared a strongbox and joint checking and savings accounts. *Cf. id.* ("Murriah did not . . . establish any joint bank accounts with Jack."); *Ex parte Threet*, 333 S.W.2d at 363 ("No charge accounts were opened in the joint name."). Thomas designated Doolittle as successor trustee for his living trust—in which he provided her a monthly allotment after his death and attempted to secure her living arrangements—and as successor executor of his estate. He gave her medical power of attorney,

17

and she was his primary caregiver near the end of his life, as witnessed by both Dr. Holcomb and Graham.

Charles, Thomas's brother-in-law, testified that Thomas "was always talking about retiring. He was going to go to Texas and retire with Lois." Doolittle testified that she and Thomas referred to each other as husband and wife, that she was good friends with his immediate family and attended his family reunions, that she represented herself as his spouse at his funeral, and that she attended a "Vietnam reunion" with him and his friends. Thomas's sister, Hermoine, testified that he and Doolittle "h[e]ld themselves out as a married couple" and "behave[d] in that certain way as a married couple." Hermoine believed that they were married by the end of Thomas's life. Charles also had the impression that Thomas and Doolittle were married and testified that they "always presented themselves as husband and wife and buying a house and doing husband-and-wife stuff." Mimms, Thomas's cousin, testified that he "[a]lways" referred to Doolittle as his wife and "always alluded to Lois being his wife." When calling to say goodbye to Mimms, he asked that she care for Doolittle because they would both be "widow[s]." Dr. Matthews likewise testified that Thomas referred to Doolittle as his wife and that he had said, "Lois and I are together. We are married." Graham, Doolittle's brother, considered her and Thomas to be married and testified that on one occasion, Thomas referred to him as his brother-in-law. Graham also testified that Doolittle "always h[e]ld herself out as married to . . . Thomas." Dr. Holcomb, a witness for Justin, testified that both Thomas and Doolittle used "collective terms" when speaking of their lives and that they were "always together." Asked whether they held themselves out to him or the public as husband and wife, Holcomb testified, "I would think that if you saw them, you would maybe make that assumption,

18

even though they didn't verbally say that." He also testified that the couple engaged in "generally intimate behavior."

Against this evidence, Justin sets testimony from himself, Nix, Carolyn, and Hinson that Thomas and Doolittle did not represent themselves as married and did not appear to be. Justin also notes that the trust agreement and 2019 special warranty deed were silent as to Thomas's marital status and that Thomas's 2015 will, which he made Doolittle read aloud to him, recited that Thomas was not married. Although Justin places particular importance on the infrequency with which Thomas referred to Doolittle as his wife and the fact that several people were unaware of the relationship, an informal marriage may be represented through conduct as well as words and may be kept secret from certain persons. *See Eris*, 39 S.W.3d at 715; *Winfield*, 821 S.W.2d at 651.

In addition, there was evidence that Hinson, Carolyn, and Nix had either distant or circumscribed relationships with Thomas. Hinson, who was Justin's friend, testified in 2021 that he had only learned of Doolittle "recently," that he had spoken to Thomas a couple of times while working out with Justin in 2020, and that he did not have conversations with Thomas about his private life. Nix, who was primarily interested in researching Carolyn's side of the family, met Thomas once and spoke with him two or three times over a period of eight years. Nix testified that he was not sure if Thomas was aware that he was compiling a family history and that he did not know if Thomas would have told him that he was married because Nix "didn't know him that well to get into his personal business." And although Carolyn testified that Thomas would have told her if he had remarried and that he had told her on multiple occasions that he was not married, she "didn't pry into his business" or "inquire into his personal matters." She explained that "[w]hatever he was doing in Texas, [she did]n't feel was really

19

[her] business." Indeed, Carolyn testified that she had not known that Thomas, whom she referred to as her "husband," and Doolittle had lived together for nine years.

Justin asserts that *Small*, a case from our sister court, provides guidance. *See* 352 S.W.3d at 286–87. We find that case readily distinguishable, however. In *Small*, all the evidence for the existence of an informal marriage came from close acquaintances of only one of the parties. *Id.* at 286. The parties did not establish a joint bank account, and the proponent of the informal marriage testified that she had no documents referring to the other party as her husband, that she would always represent on forms that she was single because her purported husband "request[ed] that she never fill out any document as 'married,'" that he in fact wanted to conceal the marriage, that he refused to represent that they were married even when it meant that she lost her health insurance after being hospitalized, that he had relationships with other women throughout their purported marriage, and that she signed the memorial book at his funeral under the "Relatives and Friends" section. *Id.* at 286–87.

We conclude that the evidence in this case supporting the trial court's finding that Thomas and Doolittle held themselves out as married amounted to more than a scintilla and that the court's finding was not so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *See Pike*, 610 S.W.3d at 783; *Wichita County*, 576 S.W.3d at 862. Because the evidence of each element of an informal marriage was legally and factually sufficient, the trial court did not err by granting Doolittle's petition for declaratory judgment. We overrule Justin's sole issue.

**CONCLUSION**

Having overruled Justin's only issue on appeal, we affirm the trial court's order granting the petition for declaratory judgment.

_____

Rosa Lopez Theofanis, Justice

Before Chief Justice Byrne, Justices Smith and Theofanis

Affirmed

Filed:   October 4, 2024